49955. JULIAN v. THE STATE.

ARGUED JANUARY 13, 1975 — DECIDED APRIL 9, 1975 —
REHEARING DENIED APRIL 23, 1975 —

*Victoria D. Little,* for appellant.
*Richard Bell, District Attorney, George N. Guest, Assistant District Attorney,* for appellee.

DEEN, Presiding Judge.
■ The enumerations of error on failure to sustain a challenge to the array of the DeKalb County grand jurors who indicted the defendant are based on the following facts:

The grand jury pool at the time of this indictment had been in existence over a year. It was composed of 1,581

names from which jury panels were chosen by random drawing. By law (Code Ann. § 59-106 as amended by Ga. L. 1968, p. 533, and Ga. L. 1973, pp. 484, 485) the names are to be selected from "a fairly representative cross-section . . . of the county from the official registered voter's list of the county as most recently revised by the county board of registrars or other county election officials." A trial will not be struck down because, provided the above law has been complied with, it so happens that the particular grand jury panel which returns the indictment or presentment is not in fact representative, nor will the court's denial of the challenge be overturned unless it appears undeniably that there has been in fact a systematic exclusion of some significantly identifiable representative segment of the population of registered voters. Further, even where the jury list is so composed, if it does not represent a "fairly representative cross-section of the intelligent and upright citizens of the county," a duty is placed on the jury commissioners to go out into the county and personally acquaint themselves with other citizens "including intelligent and upright citizens of any significantly identifiable group" and place their names upon the list. Code Ann. § 59-106, supra.

DeKalb County has a relatively low 7.5% composition of black registered voters out of a black population of 12% over 21 years of age. 3.41% of the grand jury pool were in fact black. However, whereas women comprise 52.5% of the registered voters of the county, and 53.2% of the population of the county, their representation on the grand jury was about 4%. As to white males, who comprise less than 45% of the registered voters and less than 42% of the general over-21 age group, the *average age of this white male group was 69 years.* The percentages are: white males, 92.91%; white females, 3.73%; black males, 2.97%; black females, .04%.

If any lingering doubt remained that jury pools monopolized by a specific subgroup (here, elderly white males) is a violation of the constitutional right to a jury not only fair and impartial, but a fairly representative cross-section of the community at large, that doubt has been laid to rest once and for all by the decision of the United States Supreme Court in Taylor v. Louisiana, —

U. S. — (95 SC 692, 42 LE2d 690): "Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. 'Trial by jury presupposed a jury drawn from a pool broadly representative of the community as well as impartial in a specific case' . . . Thiel v. Southern Pacific Co., 328 U. S. 217, 227. . . We are also persuaded that the fair cross section requirement is violated by the systematic exclusion of women, who in the judicial district involved here amounted to 53% of the citizens eligible for jury service. This conclusion necessarily entails the judgment that women are sufficiently numerous and distinct from men that if they are systematically eliminated from jury panels, the Sixth Amendment's fair cross section requirement cannot be satisfied."

We are urged to construe *State v. Gould,* 232 Ga. 844 (209 SE2d 312) (doubting that "any age group has such a distinctness as a group that it can be a 'significantly identifiable group' ") as a holding that age is not a criterion in the selection of juries. That case was directed to a specific contention that the 18 to 21 age group was in and of itself significantly identifiable, and we agree that no group limited to a three-year span is likely to be definitive. But where more than nine out of ten of the names available to be drawn are white males averaging in the last year of their sixth decade of life, wise as they may be, and upright and intelligent as we would grant they are, under no criterion whatever — age, sex or race — can they be considered as a block to be "a fairly representative cross-section" of either the registered voters or the general population of the county. The chance of *any* panel of grand jurors drawn from such a pool being fairly representative of the county at large is almost nil; the chance of such a pool being chosen from the population at large is, under the evidence concerning age and sex, almost as slight. As stated in Alexander v. Louisiana, 405 U. S. 625, 631 (92 SC 1221, 31 LE2d 536): "Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the state to rebut the presumption of unconstitutional action" by showing that the selection

criteria permissibly "produced the monochromatic result." As a special concurrence in that case elaborates (p. 636), the grand jury, like the petit jury, must be drawn from a representative cross section of the community, or, as quoted from Pierre v. Louisiana, 306 U. S. 354, 358 (59 SC 536, 83 LE 757): "Indictment by grand jury and trial by jury cease to harmonize with our traditional concepts of justice at the very moment particular groups, classes or races . . . are excluded as such from jury service." Exclusion may be intentional, as when women of childbearing age or female schoolteachers are intentionally omitted, or it may simply "happen" as where a disproportionately large group of retirees is available and willing. The end result is the same. In a time when the jury system itself is under widespread attack on many grounds, including the inability of the lay mind to adjust itself to complex legal problems, its one great strength lies in the deepseated human belief that one's best hope of justice lies in the judgment of one's *peers,* and the more closely the feed group mirrors the community as a whole the more likely that high hope is of fulfillment.

The discrepancy between the composition of the grand jury pool from which the panel which indicted the defendant was drawn and the composition of the community as a whole cannot be justified. The trial court erred in denying the challenge to the array. Nor can the issue be sidestepped because of the ruling in cases such as *Miller v. State,* 224 Ga. 627, 630 (163 SE2d 730) and *Estes v. State,* 232 Ga. 703 (208 SE2d 806). This special presentment was handed down within days after a mistrial and while a prior valid indictment for the same act was still in fact pending; the defendant therefore could not reasonably be expected to have such advance notice of the new presentment as to permit him to file a challenge to the array of the grand jurors prior thereto.

■ The appellant contends that he had some 60 character witnesses, 30 subpoenaed for the afternoon and the remaining 30 for the next day but that he hoped to cut down the list to 25. The defendant called five, the testimony of whom occupies some 10 pages out of a trial transcript of over 600. The court ruled that a maximum of

five character witnesses would be permitted. He then allowed the remaining 15 witnesses present in the corridors at the time to appear and line up at the side of the courtroom and answer present as their names were called, after which the court stated to counsel: "It is my understanding that you will expect each of these witnesses to testify that the character of the defendant was good," to which counsel agreed.

An interesting annotation on the subject of the trial court's discretion in limiting the number of character witnesses allowed appears in 17 ALR3d 327. Half of the states have held that such discretion exists and was not abused by limitations ranging from 1 to 25 persons. Texas (Beard v. State, 44 Tex. Crim. 402 (71 SW 960)) allows limitation or refusal to allow character witnesses where the state will stipulate that the defendant's reputation is good. In felony trials a number of states, including Georgia, have held the limitation to be reversible error. "After nine witnesses had testified to the good character of the accused, the court excluded from the jury the testimony of each of twenty-five other named witnesses who would have testified to the good character of the accused. We can conceive of cases where it would be an imposition on the court and a hindrance to justice for countless witnesses to be allowed to testify to a fact already established. However, we do not think this is such a case." *Spivey v. State,* 38 Ga. App. 213, 217 (143 SE 450) citing the oft-quoted *Shropshire v. State,* 81 Ga. 589 (8 SE 450) to the effect that evidence of good character is substantive and may of itself by the creation of a reasonable doubt produce an acquittal.

The character witnesses were offered at the close of the trial and after it became apparent that the defendant relied largely on evidence of his good character; that the prosecution relied on the testimony of a former narcotics officer, and that ultimately the jury would be forced to believe one witness and reject the testimony of the other before a verdict could be reached. Thus the proffered testimony became of crucial importance to the defendant. There had been at least one prior mistrial and the question at issue was precisely one of credibility. In such a case a mere roll call of names (without identification by

address, job position, and length of time of acquaintance) and without eliciting any statement of agreement with prior character witnesses, even en masse; without a stipulation that the evidence would in fact be as defendant's counsel contended, and without (as some of the foreign cases suggest) any acknowledgment by the state that the defendant's reputation was unblemished except for the trial at hand — such a roll call of otherwise unidentified witnesses is unlikely to be of substantial benefit. Limiting character evidence, under these circumstances, to less than two percent of total trial time would seem unduly restrictive, and must here be held to constitute reversible error.

■ It was held in Brady v. Maryland, 373 U. S. 83, that the suppression by the state of evidence favorable to an accused is a denial of due process. In *Hicks v. State,* 232 Ga. 393 (207 SE2d 30) it was held: "Brady does not require the prosecution to open its file for general inspection by the defense or for pre-trial discovery. See also United States v. Moore, 439 F2d 1107 . . . The appellant has the burden of showing how his case has been materially prejudiced, even when the trial court declines to make an in camera inspection. See United States v. Harris, 458 F2d 670, 677." Discovery under Code Title 81A is not an available remedy in a criminal case. There is no rule in Georgia requiring the state to make its evidence available to opposing counsel. *Jones v. State,* 224 Ga. 283 (161 SE2d 302); *Henderson v. State,* 227 Ga. 68, 77 (179 SE2d 76). A number of enumerations of error are directed to the defendant's unsuccessful attempts to gain information regarding the job record of the undercover agent who testified against the defendant, including subpoenas directed to him and to his immediate supervisor which were quashed on the state's motion, a refusal by the trial court to make an in camera inspection of the material to determine its relevancy, and allowing the district attorney under these circumstances to argue that the defendant's failure to produce evidence to discredit the witness proved the lack of merit of such contention. Since the case is to be tried again we do not rule directly upon these points, except to say that evidence, if it existed, that a police agent had been untrustworthy and untruthful in

other recent and similar investigations in the same manner in which the defendant contends he has been victimized, might be relevant to impeach the credibility of the witness. Whether the subpoenas were in fact directed to the right persons, and if so whether the court abused its discretion in not making an in camera inspection of the material before quashing them, cannot be decided on the record before us, and should await the event of another trial.

■ There was no error in refusing to compel the disclosure of the identity of the purported informant. *Morrison v. State,* 129 Ga. App. 558 (200 SE2d 286); *Welch v. State,* 130 Ga. App. 18 (202 SE2d 223).

■ It is not error to cross examine a character witness by asking his opinion of a person who has in fact committed the crime for which the defendant is on trial. *Holley v. State,* 191 Ga. 804 (14 SE2d 103).

■ Where evidence is both direct and circumstantial, it is not reversible error to fail to charge on circumstantial evidence in the absence of a request to do so. *Loomis v. State,* 78 Ga. App. 336 (10) (51 SE2d 33). But even in such event, if a timely and correct written request is made it should be given. *Jones v. State,* 91 Ga. App. 662 (86 SE2d 724). And where it has become a jury question whether the witness upon whose *direct* evidence the state depends has been impeached, a failure to charge on circumstantial evidence is reversible error. *Horne v. State,* 93 Ga. App. 345 (4) (91 SE2d 824). For both these reasons the failure to give the requested charge on circumstantial evidence was error.

■ The substance of the remaining instructions given the jury on which error is enumerated was correct. Other enumerations of error, which are waived, or which concern points such as those dealing with motions for mistrial not likely to recur are not passed upon. There was sufficient evidence to support the verdict as against a motion for acquittal and the general grounds of the motion for new trial.

*Judgment reversed for the reasons stated in Divisions 1, 2 and 6 of this opinion. Bell, C. J., Pannell, P. J., Quillian, Clark, Stolz, Webb and Marshall, JJ., concur. Evans, J., concurs specially.*

EVANS, Judge, concurring specially.

I concur in the reversal by the majority opinion, but dissent from certain parts thereof.

1. I dissent from Division 1 of the majority opinion which sustains defendant's challenge to the array of jurors and cites imposing authority for such position. I do not agree with those authorities that would impose an almost impossible task upon the jury commissioners as to "selection of a representative cross-section of the citizenry of the county" before a legal trial of one charged with crime may take place. I therefore do not feel compelled to follow any such impossible theory.

The present trend is that all too often those charged with crime are able to upset the jury list because of the allocation of percentages of whites, blacks, males, females, etc. To reduce this position to an absurdity (reductio ad absurdum) which is a well recognized and logical process of reasoning, we may soon reach the point where a defendant can be legally tried only by a jury of his own color, sex, height, weight, religious leaning, political philosophy, and state of health. And let us not forget to match the color of his eyes, and hair, and skin. This is indeed "reductio ad absurdum," but it is illustrative of the direction in which our courts are heading. I would call a halt to this practice.

An important part of the controlling Georgia statute on this subject is being overlooked, disregarded, and contravened. Our statute provides in pertinent part: Code Ann. § 59-106: "If at any time it appears to the jury commissioners that the jury list, so composed, *is not a fairly representative cross-section of the intelligent and upright citizens of the county,* they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of the county, *including intelligent and upright citizens of any significantly identifiable group in the county* which may not be fairly representative thereon."

This statute is quite plain. The jury commissioners have no duty whatever to supplement the jury list so long as it appears to them that it "is a fairly representative cross-section of the *intelligent and upright* citizens of the county." But, if the jury commissioners decide that the

jury list *does not have thereon a fairly representative cross section of the intelligent and upright citizens of the county,* then, and only then, they are directed to seek out intelligent and upright citizens *from identifiable groups in the county.* We repeat, *the identifiable groups do not come into the picture — have no standing and no right to be projected therein — so long as the jury list is composed of a cross-section of the fairly representative intelligent and upright citizens of the county.*

The Constitution of the United States, the Constitution of Georgia, and the statutes of Georgia make no such requirement as some courts are now imposing. See Code §§ 1-304, 1-806; Code Ann. §§ 2-105, 2-5101, 2-5102, 59-106. The requirements are that the jurors must be *upright, intelligent, impartial,* and *residents of the county.* By what right have the courts superimposed additional requirements onto our Constitution and statutes?

Is a *bachelor* entitled to have a proportionate number of bachelors in the jury box before he can be legally tried? Is a *divorcee* entitled to a similar requirement? If an emigrant from another country is naturalized here, and is about to be placed on trial in a criminal case, must the jury list be revised so it can have added thereto a proportionate number of naturalized emigrants from foreign countries. Quo Vadis?

2. The majority opinion suggests in Division 3 that Georgia does not have discovery in criminal cases, although that point is not essential to the decision therein made. I agree with the results, but I am firmly of the opinion that Georgia statutes *do provide* for discovery in criminal cases. Code Ann. § 38-801 sets forth provisions for discovery in all cases, and is followed by Code Ann. § 38-802 as follows: "Section 38-801 shall apply to all civil cases, and, insofar as consistent with the Constitution, *to all criminal cases.*" (Emphasis supplied.) I find nothing in the Constitution inconsistent with discovery in criminal cases.