### 41619. PARKS v. THE STATE.
(330 SE2d 686)

</div>

GREGORY, Justice.

This is a death penalty case. Appellant, Joseph Russell Parks, was convicted in DeKalb County of murder, rape and aggravated sodomy.[1]

### Facts

The victim, 10-year-old Agnes Ann Watts, disappeared early in the evening of September 17, 1981. At 10:45 p.m., her body was discovered behind the refrigerator in an empty apartment from which Joseph Parks and his girl friend, Elise Talent, had recently been evicted by the victim's mother, who managed the apartment complex.

---

[1] The jury returned its sentencing verdict on April 23, 1982. A motion for new trial was filed May 21, 1982, and an amendment thereto was filed February 17, 1983. The trial court denied the motion for new trial on August 15, 1984. A notice of appeal was filed September 12, 1984, and the case was docketed in this court on October 15, 1984. The case was orally argued January 22, 1985.

By 1:00 a.m., investigators learned that Parks and his girl friend had been the most recent occupants of the apartment, and that Parks had been seen in the area about the time the victim had disappeared.

An attempt to contact Parks at his new residence was unsuccessful, as he and Ms. Talent were out, so the police left word with a mutual friend of the couple that they should contact the police upon their return. They did and were asked to come to the police station.

Parks and Ms. Talent arrived at about 4:00 a.m. and were questioned separately.

Ms. Talent stated that sometime between 6:30 and 8:00 p.m. on the 17th, Parks had told her that a child's body had been found behind a refrigerator in an empty apartment at their former apartment complex. She asked him if the empty apartment was their old apartment and he stated that he thought so. This statement was reduced to writing at 8:08 a.m.

Parks was questioned off and on throughout the day. He denied knowledge of the crime, claiming: "[I]f I did it, I didn't know I did it." Early in the morning, his clothes were removed from him and he was given a set of "jail blues" to put on. Later in the morning, Parks was examined by Dr. Joseph Burton, Medical Examiner for DeKalb and Cobb counties. (Parks testified that he wanted to prove his innocence, so he let them take all the tests they wanted.)

That afternoon, Parks again stated that if he had done it, he did not know it. However, he was able to pick out the victim from a picture of three young girls, and he admitted that he "might have" seen her at the entrance to the apartment complex and that she "could have flagged him down and asked him for a ride" or that "he could have . . . stopped and offered her a ride to her apartment." Then he stated that "it could have happened in the car or it could have happened in the apartment," and that "if he did it, he wanted some kind of help." When asked what he had done with the victim's clothes, Parks said that he "could have" thrown them "out behind the apartment" or else "out of the car when he left the apartment complex."

Late in the afternoon of September 18, Parks was formally arrested. Between January 27 and February 19, 1982, Richard Gaily occupied the cell adjacent to the one occupied by Parks. Over a period of time, Parks admitted to Gaily the details of the crime.

Parks told Gaily that he had gone to his old apartment and the girl was already inside, in the bedroom. He grabbed her around the neck, threw her down on the floor, "snatched off the bottoms," and raped and sodomized her. Then he strangled her, and, realizing she was dead, placed her in a corner of the kitchen. Parks stated that he did it for revenge, because the girl's mother had evicted him from the apartment. He told Gaily that he had told the police he had been at the apartments at 3:30 and again at 8:00 p.m., but in fact he had also

been there at 5:45, and he was afraid that one witness who lived in the area was going to testify to that fact. (He did.)

Dr. Burton conducted the autopsy on the body of the victim. He estimated the time of death to be 6:00 p.m., give or take an hour or two. Cause of death was ligature and manual strangulation coupled with sexual trauma to the uterus and anus. Bruises on the victim's arms, legs and chest indicated that the child had struggled with her attacker.

Dr. Burton also examined Parks. He observed recent bruising and abrasions on Parks' arms, as well as a fresh abrasion on his scrotum. A fiber was discovered in his fingernail that was consistent with having come from the sweater that was around the victim's neck when she was found, and his pubic hair was found to be similar to one discovered on the victim's body.

The evidence was sufficient to support the convictions. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Enumerations of Error

1. Parks contends in his 1st enumeration of error that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the admission in evidence of statements he made while in police custody on September 18, 1981.[2]

The record shows that when Parks was questioned, he was to some extent still under the influence of preludin (described by Dr. Burton as a synthetic amphetamine-type drug) that he had taken the night before. However, the record does not require a finding that Parks was by reason of this drug usage incapable of knowingly, voluntarily, and intelligently waiving his *Miranda* rights.

The record also shows that Parks did not sign a written waiver of

---

[2] It is clear from appellant's brief that he is here relying upon the Fifth Amendment as that Amendment applies to the states by virtue of the Fourteenth Amendment. Citation to the Sixth and Eighth Amendments we regard as superfluous. (However, regarding any possible Sixth Amendment objection, see *Ross v. State,* 254 Ga. 22 (3b) (326 SE2d 194) (1985)).

We note that no Fourth Amendment objections were raised at trial or on appeal. Compare *Devier v. State,* 253 Ga. 604 (7a) (323 SE2d 150) (1984). It is undisputed that when Parks first arrived at the police station, and for some time thereafter, Parks was not in custody. Because no Fourth Amendment issue was litigated, the evidentiary presentation by neither side directly focused upon (1) at what point the questioning became custodial, or (2) at what point police obtained sufficient probable cause to lawfully arrest Parks. However, we note that by at least 8:00 a.m. on the 18th, police knew: (1) Parks was the most recent occupant of the vacant apartment in which the victim's body had been found; (2) He had been by the apartment complex about the time the victim disappeared; (3) According to Parks' girl friend, he knew where the victim's body was at least 3 hours before it was found; and (4) Parks did not absolutely deny committing the crime, instead stating, "[I]f I did it, I didn't know I did it."

rights until just before he gave a written statement the afternoon of September 18. However, the record provides no support for Parks' contention that statements were elicited from him only after "repeatedly unsuccessful attempts on the part of police officers to obtain a signed waiver of rights . . ." Brief of Appellant, pp. 9-10.

The trial court found that Parks "knowingly, intelligently, and voluntarily waived his constitutional rights after being advised thereof as required by *Miranda v. Arizona,* [384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966)]" and that considering the totality of the circumstances his "written statement and his oral admissions were made voluntarily, without being induced by hope of benefit or fear of injury." Record, p. 91. These findings are not clearly erroneous and we therefore accept them. *Rose v. State,* 249 Ga. 628 (2) (292 SE2d 678) (1982).

We find no merit to Parks' contention that, because the trial court did not make explicit findings of voluntariness until after trial, this case must be reversed. *Cofield v. State,* 247 Ga. 98 (4) (274 SE2d 530) (1981).

2. After the charge of the court at the guilt phase of the trial, the jury was sent to the jury room with the usual instructions that it was not to begin its deliberations until it received the indictment and the exhibits admitted in evidence. Then the court instructed the attorneys to review the exhibits to make sure that only those items which were supposed to go to the jury room went there. When they stated to the court that their review was completed, the court stated: "Let the record show that everything that is going to the jury room is agreed to by counsel to be only that which is to go to the jury room; is that right?" Attorneys for both sides agreed that was correct, and the items they had gathered together were sent to the jury.

Next, the court began the checklist review required by Rule III (A) (3) (b) of the Unified Appeal Procedure. See 252 Ga. at p. A-23. During this review, the court asked, "Where's the defendant's written statement?" The assistant district attorney did not know, and one of Parks' attorneys stated: "Ten to one it went out." The court sent the sheriff to the jury room to retrieve the exhibit and it was back in the courtroom less than 10 minutes after it had been given to the jury.

In his 2nd enumeration, Parks contends the court committed reversible error by permitting the written statement to be seen by the jury. See *Royals v. State,* 208 Ga. 78 (2) (65 SE2d 158) (1951). Under the circumstances recounted above, we find no reversible error.

3. Parks filed a pre-trial motion seeking, among other things, discovery of arguably exculpatory written statements of any person interviewed by any agent of the state in connection with this case, and an in camera inspection of the state's file. See *Tribble v. State,* 248 Ga. 274 (280 SE2d 352) (1981). The trial court conducted an in cam-

era inspection and ordered that a number of items be furnished to Parks. However, for some unknown reason, the state's file did not include a written statement taken from Jan Brown (who lived with Parks and Elise Talent). Thus, her statement was not furnished prior to trial.

Jan Brown was called by the defense as an alibi witness. She testified that from 4:15 until after 8:00 p.m. on the evening of September 17, Parks was at home. On cross-examination, she admitted that she had been on the telephone during part of this time. The state then used her written statement to remind her that she had received three phone calls during this time, in an effort to show that she had been too distracted by other matters to know for sure that Parks had not been out at least some of this time.

After the conclusion of her testimony, the trial court stated: "Let the record reflect that . . . in going through the court's copy of the district attorney's file . . . I do not find a statement from Mrs. Jan Brown . . . [A]pparently . . . [it] was not in the file . . . A copy of Mrs. Brown's statement has now been provided to the defense . . ."

In his 3rd enumeration, Parks contends that the failure to disclose this statement violated his rights under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).[3]

Although Parks speaks of a failure to disclose, in fact, the statement was disclosed, albeit only after the trial commenced. See *Castell v. State*, 250 Ga. 776, 781 (301 SE2d 234) (1983). Thus, " '[t]he appropriate standard to be applied [here] . . . is whether the disclosure came so late as to prevent the defendant from receiving a fair trial.' [Cit.]" *United States v. Sweeney*, 688 F2d 1131, 1141 (7th Cir. 1982).

Parks argues that if the statement had been timely furnished, then possibly the defense could have developed corroboration of Parks' alibi, by talking to the persons with whom Mrs. Brown had spoken on the telephone. For example, Parks hypothesizes that one of these callers might have said, "Yeah, I remember Jan was yelling to Rusty [Parks] to be quiet. That was about 6:15." Transcript, Motion for New Trial, p. 86.

Despite having ample opportunity to demonstrate that earlier disclosure would have led to the discovery of further alibi witnesses (see Rules IV (A) (5) (b) and IV (A) (6) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq.), Parks has offered no more

---

[3] The statement is not in the record. However, it is reasonably clear from the references to it in the record that Mrs. Brown had stated that Parks was at home during the probable time of the murder. If that is the case, then it should have been furnished whether or not Parks' *Brady* request was specific. *United States v. Oxman*, 740 F2d 1298, 1301 (3rd Cir. 1984). In view of our disposition of this enumeration of error, we need not determine whether the request was specific or whether Parks' failure to put a copy of the statement in the record would be fatal to his claim of *Brady* error.

than speculation (of dubious plausibility) that such witnesses *might* have been discovered. See *Ross v. State*, 254 Ga. 22, 30 (326 SE2d 194) (1985). Parks has failed to meet his burden of establishing that he was denied beneficial evidence of such importance that he did not receive a fair trial. *Rose v. State*, supra, 249 Ga. at 629.

4. In his 4th and 6th enumerations, Parks contends his character was impermissibly placed in issue.

Regarding proof of his drug usage the day of the crime, we agree with the state that this evidence showed: (1) Parks' state of mind at the time of the commission of the crime (see *Walraven v. State*, 250 Ga. 401, 408 (297 SE2d 278) (1982)); and (2) his mental and physical condition during the time he was being interrogated (see *Mincey v. State*, 251 Ga. 255, 266 (304 SE2d 882) (1983)).

The drug usage was part and parcel of the crime on trial, and was not inadmissible simply because it might have incidentally reflected on Parks' character. *Felker v. State*, 252 Ga. 351 (1) (314 SE2d 621) (1984); *Putman v. State*, 251 Ga. 605 (2) (308 SE2d 145) (1983).

Parks also complains of the admission of testimony that after he was formally arrested he called one of the interrogating officers an obscene name. He argues that this evidence, although proving the commission of no crime, nonetheless was irrelevant evidence of bad character. See *Felker v. State*, supra at 365. While we hold that this evidence was irrelevant, we find it highly probable that this testimony did not contribute to the verdict. Therefore, we find no reversible error here. *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976).

5. Pre-autopsy photographs of the victim were relevant and admissible. *Ramey v. State*, 250 Ga. 455 (1) (298 SE2d 503) (1983). Enumeration 7 is without merit.

6. Parks contends that blacks were significantly underrepresented on the grand jury list in effect at the time of his indictment, and that young persons between the ages of 18 and 29 were underrepresented on the grand and traverse jury lists. In his 8th enumeration of error, Parks contends the trial court erred by denying his jury challenges.

(a) We first address Parks' allegation that blacks are significantly underrepresented on the grand jury list. Viewing the evidence in the light most favorable to the defense, Parks has shown only a 5.24% underrepresentation of blacks (23.45% in the community versus 18.21% on the grand jury list). This is not such a significant disparity as would require quashing the indictment.[4] *West v. State*, 252 Ga. 156

---

[4] Recently promulgated Rule II (A) (b) of the Unified Appeal Procedure, 252 Ga. at A-17, is inapplicable to this case, which was tried in 1982. That rule, which requires correction of absolute disparities exceeding 5%, was designed to ensure to the extent possible that disparities would be kept well below the constitutional minimum. The disparity shown here is almost low enough to meet even this prophylactic rule and shows no unconstitutional

(1) (313 SE2d 67) (1984); *Wilson v. State*, 250 Ga. 630 (6a) (300 SE2d 640) (1983).

(b) Next, we address the underrepresentation of persons between the ages of 18 and 29.

The evidence shows that persons between the ages of 18 and 29 (inclusive) comprise 33.3% of the 18 and over population of DeKalb County, 18.3% of the traverse jury list, and only 4.54% of the grand jury list.

DeKalb County uses a computer to select names from the voter list for inclusion on the traverse jury list. To compensate for the underrepresentation of blacks on the voter list, the computer selection process is not race-neutral (see below); however, it is age neutral, and insofar as age is concerned, selection from the voter list for inclusion on the jury list is completely random. Thus, any underrepresentation of young persons on the traverse jury list results from their underrepresentation on the voter registration list.

On the other hand, the testimony shows that the significant underrepresentation of young persons on the grand jury list is the result of an attempt by the jury commissioners to comply with the directive of OCGA § 15-12-40 that only the "most experienced" traverse jurors be selected for inclusion on the grand jury list.

Over the state's objection, Parks was allowed to present expert testimony comparing the attitudes and values of persons between the ages of 18 and 29 with those of other age groups. After hearing this evidence, the trial court made a finding of fact that: "There are, in fact, according to the evidence presented, sufficiently distinct differences in relevant attitudes and beliefs held by the 18 to 29 age group from other adults to warrant the recognition of this group as a significantly identifiable group requiring their representative inclusion on the Grand and Traverse Jury Lists." Record, p. 84.

The trial court denied the challenge, however, because it interpreted our cases to say that young persons can never constitute a cognizable group for purposes of jury challenge. See, e.g., *Thomas v. State*, 248 Ga. 247 (3) (282 SE2d 316) (1981); *Bowen v. State*, 244 Ga. 495, 500 (260 SE2d 855) (1979); *Davis v. State*, 241 Ga. 376 (1) (247 SE2d 45) (1978); *Hudson v. State*, 240 Ga. 70, 71 (239 SE2d 330) (1977).

More recently, the 11th Circuit Court of Appeals has held: "Whether or not a class of persons is . . . sufficiently distinct and cognizable for sixth amendment fair-cross-section analysis is a question of fact . . . The distinctiveness and homogeneity of a group under the sixth amendment depends upon the time and location of

---

underrepresentation.

the trial." *Willis v. Zant*, 720 F2d 1212, 1216 (11th Cir. 1983) (cert. denied, 103 SC 3546). We, too, have recognized that cognizable groups might be defined by factors other than race or sex. *Holcomb v. State*, 254 Ga. 124 (2) (326 SE2d 760) (1985). See also *West v. State*, supra, 252 Ga. at 162-163 (Gregory, J., concurring.)

Thus, we cannot agree with the state's contention that as a matter of law young persons can *never* constitute a distinct group cognizable in a jury challenge.

In this case, the defendant proved a statistically significant underrepresentation of a group which the trial court found to be distinct and identifiable. Assuming without deciding that the evidence authorized this finding and that the group should therefore be recognized, the inquiry nonetheless does not end here. Remaining to be resolved is the *legal* significance of the disparity, in the context of a defendant's right to equal protection of the law under the Fourteenth Amendment, and to a jury venire representing a fair-cross-section of the community under the Sixth Amendment and under OCGA § 15-12-40.

"[P]recise mathematical standards for gauging disparity have not been formulated." *West v. State*, supra at 158. However, "approximate boundaries" for acceptable underrepresentations of groups defined by race or sex have been delineated in numerous cases. See *Machetti v. Linahan*, 679 F2d 236 (11th Cir. 1982). For reasons which follow, we conclude that these boundaries are inappropriately strict for application to other distinct groups.

Equal protection doctrine does not forbid the making of any distinctions, nor require that all forms of discrimination be given equally intense judicial scrutiny. Certain groups have been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 28 (93 SC 1278, 36 LE2d 16) (1973). Thus, classifications based upon race, nationality, or sex call for close (or strict) judicial scrutiny. *Orr v. Orr*, 440 U. S. 268 (99 SC 1102, 59 LE2d 306) (1979) (sex); *McLaughlin v. Florida*, 379 U. S. 184 (85 SC 283, 13 LE2d 222) (1964) (race); *Oyama v. California*, 332 U. S. 633 (68 SC 269, 92 LE 249) (1948) (nationality). Other classifications, including classifications based on age, have not been subjected to such scrutiny. *Vance v. Bradley*, 440 U. S. 93 (99 SC 939, 59 LE2d 171) (1979); *Massachusetts Bd. of Retirement v. Murgia*, 427 U. S. 307 (96 SC 2562, 49 LE2d 520) (1976).

The right to a jury representing a fair-cross-section of the community (derived from the Sixth Amendment, as applied to the states by the Fourteenth) is not "entirely analogous" to the right of equal

protection of the law respecting jury selection procedures. *Duren v. Missouri*, 439 U. S. 357, 368 (n. 26) (99 SC 664, 58 LE2d 579) (1979). Nonetheless, the similarities have not gone unnoticed. Id. at 1370-71 (Rehnquist, J., dissenting) (comparing means of justifying gender disparities under the Sixth Amendment with means of justifying gender classifications under the equal protection clause). See also *Willis v. Zant*, supra, 720 F2d at 1216 (citing *Hernandez v. Texas*, 347 U. S. 475 (74 SC 667, 98 LE 866) (1954), an *equal protection* case, for the proposition that the cognizability of a particular group, for Sixth Amendment fair-cross-section analysis, is a question of fact).

Thus, we conclude that we were correct when we stated, over ten years ago, that: "It is not necessary here for us to rule that persons of the age group 18 to 30 cannot ever be a constitutionally cognizable group for purposes of jury selection . . . Young persons, though they certainly belong in the cross-section, do not make up a constitutionally highly protected class, that is, one which has suffered oppression and discrimination; and their claimed underrepresentation does not invoke a high standard of judicial review." *Payne v. State*, 233 Ga. 294 at 308-309 (210 SE2d 775) (1974).

With the foregoing in mind, we return to the facts of this case.

Young persons are greatly underrepresented on the DeKalb grand jury list. However, this underrepresentation is explained by the jury commissioners' compliance with the legal requirement that only a limited number of the "most experienced" persons on the traverse jury list be selected for inclusion on the grand jury list. The fair-cross-section language of OCGA § 15-12-40 obviously must be read in light of the grand jury experience requirement in the same code section. Thus we find no statutory violation in the grand jury age make-up. Nor do we find any federal constitutional violation. Experience and age are rationally related, and in view of the duties of grand juries (in addition to returning criminal indictments) we do not find the statutory demand for experience to be unjustified. See OCGA §§ 15-12-75, 76, 77, 78, 79 and 80. The age disparities shown here are acceptable. Compare *Julian v. State*, 134 Ga. App. 592 (1) (215 SE2d 496) (1975) (grand jury list consisting of persons averaging 69 years of age was unacceptable).

Young persons are also underrepresented on the DeKalb traverse jury list. This underrepresentation, however, did not result from subjective manipulation of the source list, but rather, from the fact that the source list itself contained an underrepresentation of young persons.

The source list, of course, was the voter registration list, the primary source contemplated by OCGA § 15-12-40. Some convenient list obviously is needed in a metropolitan county like DeKalb, which has nearly half a million people according to the 1980 official census. The

voter list has the advantage that qualifications for voting and qualifications for jury service are nearly the same. Compare 1983 Const., Art. II, Sec. I, Par. II, with OCGA § 15-12-163. It is therefore more likely to be representative of the eligible members of the community than other lists that might be available (e.g., driver's license lists, tax lists, and the like).

Still, the voter list might underrepresent some distinct, identifiable group in the community and, by law, the jury commissioners have the power to supplement it. See *Ingram v. State*, 253 Ga. 622 (1 d) (323 SE2d 801) (1984). In practice, however, such supplementation can be difficult, as testimony regarding efforts to correct the underrepresentation of blacks illustrates.

In the years preceding this trial, the DeKalb jury commissioners had been aware that blacks were underrepresented on the voter list and, hence, on the jury list. The commissioners, one of whom was black, did not personally know enough blacks to add to the jury list to significantly change the percentages (which is understandable in view of the size of the list). The commissioners met with a number of prominent black community leaders to discuss ways of correcting the disparity. Various attempts were made to increase black voter registration, to distribute forms for inclusion on the jury list, and to place articles in newspapers encouraging jury service. These efforts were largely unsuccessful. The commissioners considered alternative source lists. The state driver's license file did not have a "county code" or a "race code" in its computer program and was therefore essentially unusable. The tax file was duplicative, and the water and sewer files contained the names primarily of property owners. Finally, as an interim solution, the jury list was computer manipulated to decrease the number of whites on the list, which brought the black percentages in line. At the time of this trial, a more permanent solution was still being worked on.

Such herculean efforts to correct an underrepresentation of a "suspect" class doubtless are required. However, given the size of the task, and keeping in mind that the same voting registration standards apply to persons between the ages of 18 and 30 as to persons over 30 and that "the status of being a voter or a non-voter essentially may be changed at will," *(Ingram v. State*, supra at 629), we conclude that such efforts are unnecessary to correct a 15% underrepresentation of young persons, even where, as here, the trial court has found such a class to be cognizable.[5] Thus, we find no error in the denial of Parks'

---

[5] Of course, the list could have been further manipulated by removing names of persons 30 and over until the age percentages were equalized. Such an attempt, however, would cause problems of its own. First, obviously, is that the size of the list would be greatly reduced (after already being halved by the race manipulation). Second, random reduction on the basis

challenges to the DeKalb grand and traverse juries.

7. In his 9th enumeration, Parks contends the trial court erred by refusing to excuse three prospective jurors whose voir dire answers demonstrated a disqualifying bias.

Two of these prospective jurors "were not challenged at trial and the trial court did not err by failing to excuse these jurors on the court's own motion." *Spivey v. State*, 253 Ga. 187, 194 (319 SE2d 420) (1984).[6]

The remaining juror had heard something about the crime, but had no opinion as to guilt and she stated that she could impartially evaluate the evidence. The trial court did not err by refusing to excuse this juror. *Devier v. State*, 253 Ga. 604 (3) (323 SE2d 150) (1984).

8. We find no merit to Parks' 10th enumeration, in which he contends that the trial court overly restricted the voir dire examination. Id. at 606.

9. The court did not err by failing to disqualify the entire venire on its own motion because of a comment by a prospective juror. Cf. *Wilson v. State*, supra, 250 Ga. at 636-37 (6). Enumeration 11 is without merit.

10. The practice of death-qualification of jurors is not unconstitutional. *Mincey v. State*, supra, 251 Ga. at 257-59 (2). Enumeration 12 is meritless.

11. The court did not err by excusing four prospective jurors conscientiously opposed to the death penalty. Their opposition to capital punishment, and their inability to impose it, is clear from the record. Parks' 13th enumeration is without merit. *Wainwright v. Witt*, ___ U. S. ___ (105 SC 844, ___ LE2d ___) (1985).

12. At the guilt-innocence phase of the trial, the court charged malice as it is defined in OCGA § 16-5-1 (b). After the jury had been deliberating for a while, it sought clarification of the concept of "mal-

---

of age alone might result in racial or sexual age disparities, such as, for example, the overrepresentation of young white females or the underrepresentation of older black males. Programming to balance by race, age and sex simultaneously would even further reduce the size of the list. Moreover, an unintended result of such manipulation might be the underrepresentation of some other distinct and identifiable group in the community. All this is simply to say that the greater the manipulation, and the smaller the size of the list, the more likely it is that the list will fail to represent a true cross-section of the community.

[6] Parks claims that one of these two, Ms. Allen, was the most egregiously biased of the three. Initially, she indicated that she might have difficulty putting aside what she had read about the case and being a completely fair and impartial juror. She was questioned at length by the court and finally the court asked her what she had read. She answered, "Am I wrong that it's the one about the bus — the lady — the MARTA bus?" Upon being informed that this case had nothing to do with the MARTA bus driver, and being acquainted briefly with the allegations in this case, the juror responded that she had read nothing about this case. The juror was later peremptorily struck by the state. OCGA § 15-12-165.

ice aforethought" and "its relationship to premeditation, if any."

The court re-charged the language of OCGA § 16-5-1 (b) and then proceeded as follows:

"Now, since you asked in your note for an explanation of the relationship between malice and premeditation, if any, I will at this point give you an additional charge in that connection that I did not give you previously.

"The mental intention for malice murder is malice which can be described as an intention to kill another human being.

"There are two kinds of malice, express and implied. Express malice is that which is proven by the defendant's own actions. The mental state of express malice is not to be confused with premeditation, which some jurisdictions define as the mental state required for first degree murder. Premeditation is not an element of murder in Georgia, and the malice which is required for murder can be formed in an instant so long as it is present at the time of the act of killing.

"The intention to kill, like any other intention, is rarely capable of proof out of the mouth of the defendant or through prior specific prior [sic] acts connected to the defendant. Therefore, the murder statute provides that there can be a finding by a jury of implied malice. *Implied malice is an intention to kill which is proven either by the act of killing itself, the surrounding circumstances, or the absence of any provocation.*" (Emphasis supplied.)

In his 14th enumeration of error, Parks contends this instruction was unconstitutional under the standards established by the United States Supreme Court in cases such as *Sandstrom v. Montana*, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979); and *Mullaney v. Wilbur*, 421 U. S. 684 (95 SC 1881, 44 LE2d 508) (1975). We must agree.

In considering a possible *Sandstrom* violation, "we must first determine what construction a reasonable juror might have placed on the contested charge." *Johnson v. State*, 249 Ga. 621, 622 (292 SE2d 696) (1982). Here, a reasonable juror could have construed the portion of the court's charge emphasized above as an "irrebuttable direction" (*Sandstrom*, supra at 517) to find intention to kill upon proof of either (1) absence of provocation, or (2) the act of killing itself.[7]

Intent to kill is an essential element of both murder and voluntary manslaughter. OCGA §§ 16-5-1 and 16-5-2. Provocation, or the lack thereof, is what distinguishes the two offenses. Proof of the absence of provocation may not substitute for proof of intent to kill, as

---

[7] The court's instruction that intent could be proven by "the surrounding circumstances" is not constitutionally unsound, as it was simply a way of saying that the jury could rely upon circumstantial evidence in finding intent. However, "(i)t has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside. [Cits.]" *Sandstrom*, 442 U. S. at 526.

the court's charge erroneously implied. See *Davis v. State*, 237 Ga. 279 (2) (227 SE2d 249) (1976).

The act of killing must also be proved in a murder case. That is, in addition to proving malice, the state must prove a homicide, i.e., that the defendant "cause[d] the death of another human being." OCGA § 16-5-1 (a). Proof of this element of the offense of murder cannot, as the court's charge erroneously implied, relieve the state of its burden to prove malice beyond a reasonable doubt. *Johnson v. State*, supra (1b).

Viewing the erroneous charge in the context of the charge as a whole, as we must do (*Felker v. State*, supra, 252 Ga. at 381), we cannot say that the error was neutralized by the court's general instructions, which were not theoretically inconsistent with the erroneous charge. See *Sandstrom* at 518 (n. 7). Nor can we say the error was harmless beyond a reasonable doubt. Compare *Lamb v. Jernigan*, 683 F2d 1332, 1342 (11th Cir. 1982).[8]

Since the foregoing discussion demonstrates the necessity of reversing Parks' conviction for murder, we need not address his contention that other portions of the re-charge also were erroneous.

13. In his 5th enumeration, Parks complains of numerous alleged instances of prosecutorial misconduct. In only one instance was a contemporaneous objection made (during the state's examination of a witness at the guilt-phase of the trial). Parks did not seek a ruling on this objection.

We find no misconduct so egregious as to require reversal of the convictions despite the lack of contemporaneous objection. *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983).

The trial court found on motion for new trial that prosecutorial argument at the sentencing phase of the trial was so egregiously improper as to have resulted in a death sentence influenced by passion, prejudice or other arbitrary factor. See OCGA § 17-10-35 (c) (1). Since the death sentence must be vacated along with Parks' conviction for murder, we need not determine whether this finding would by itself require reversal of the death sentence.[9]

---

[8] A plausible interpretation of the state's evidence is that Parks unintentionally killed the victim while trying to stop her struggling. If this is what the jury found as fact, then it would not have been authorized to find malice murder under a correct charge, although it may very well have done so under the charge given. (Of course, a finding of felony murder would have been authorized, but felony murder was not charged. See also footnote 7 above.)

[9] Although making this finding, the trial court denied the motion for new trial because it misconstrued *Conner v. State*, supra, as holding that improper argument, not objected to, can never justify reversal of the death sentence. In fact, we have expressly recognized the possibility that egregiously improper argument might require reversal, even in the absence of objection. See, e.g., *Prevatte v. State*, 233 Ga. 929 (6) (214 SE2d 365) (1975) (cited in *Conner* at p. 122). See also *Walker v. State*, 254 Ga. 149 (14) (327 SE2d 475) (1985), and cases cited therein.

Nevertheless, we take this opportunity to reiterate that prosecutors should not inject into their arguments "extrinsic and prejudicial matters which have no basis in the evidence. [Cit.]" *Conner v. State*, supra at 123. Closing argument is not an opportunity for the prosecutor, in effect, to present additional testimony.

In his argument in this case, the prosecutor described his own visit to the crime scene, observing among other things that "death was in the air," and that "seasoned officers" were "openly sobbing and trembling." He described his difficulty sleeping at night. He told the jury of his conversations with the defendant's parents outside the courtroom, and he talked about his prayers for his children.

These and other improprieties will doubtless be avoided on retrial.

14. Parks' 15th enumeration of error, in which he contends the trial court erred at the sentencing phase of the trial by charging that, whatever the jury's verdict was, it had to be unanimous, is without merit. "The instruction given was a correct statement of the law," *Allen v. State*, 253 Ga. 390, 393 (2) (321 SE2d 710) (1984); and "the trial court is not required to instruct the jury that lack of unanimity forecloses imposition of the death penalty . . ." *Legare v. State*, 250 Ga. 875, 877 (302 SE2d 351) (1983).

15. Any possible error shown by enumeration 16 may be avoided on retrial by compliance with *West v. State*, supra, 252 Ga. 158-60 (2).

16. The state is not precluded from urging the presence of both OCGA §§ 17-10-30 (b) (2) and (b) (7) simply because rape is a fact supporting both circumstances. *Castell v. State*, supra, 250 Ga. at 794; *Waters v. State*, 248 Ga. 355 (11) (283 SE2d 238) (1981). Enumeration 17 is without merit.

17. Enumeration 18, complaining of the adequacy of the court's charge on mitigating circumstances, is answered by *Ross v. State*, supra, 254 Ga. at 31-33 (6).

18. We find no merit to Parks' 19th enumeration, in which he contends that the death penalty in Georgia, and particularly in DeKalb County, has been enforced in an arbitrary, capricious, and racially discriminatory manner. See *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985).

19. The convictions for rape and aggravated sodomy are affirmed. The conviction for murder and the death sentence based thereon are reversed.

*Judgment affirmed in part, reversed in part. All the Justices concur, except Marshall, P. J., Smith and Weltner, JJ., who dissent.*

WELTNER, Justice, dissenting.

I concur in the results indicated in each of the divisions of the

majority opinion with the exception of Division 12, relative to presumptions. I dissent to so much of the judgment as effects reversal, and I concur specially as to Division 6 of the opinion.

1. In Division 6, the majority addresses the challenge directed to an underrepresentation of young people in the grand and traverse jury lists. It does so, having accepted the trial court's factual determination that there is a substantial mathematical disparity between the percentage of young voters on the lists and the percentage of young voters resident in the county, and the further finding that there are "sufficiently distinct differences in relevant attitudes and beliefs held by the 18 to 29 age group from other adults to warrant the recognition of this group as a significantly identifiable group requiring their representative inclusion on the Grand and Traverse Jury Lists."

I would reject this challenge, as the majority comes finally to do, but on another ground.

A three-judge panel of the Eleventh Circuit in *Willis v. Zant*, 720 F2d 1212 (11th Cir. 1983), expresses the opinion that a similar challenge cannot be rejected as a matter of law, but that whether or not young adults constitute a "cognizable group" under the Sixth Amendment's standard must be determined as a matter of fact. In *Willis*, supra, the petitioner contended that the young persons he claims were excluded were "the only South Georgians who were reared and educated in a desegregated society. Thus, the white members of this group could more easily understand and relate to petitioner, a twenty-three year old black man, than could older whites." 720 F2d at 1217. The holding of that court then followed: "We do not comment on the merits of petitioner's contention; rather, we vacate the denial of relief on this issue and remand it to the district court for an evidentiary hearing. Petitioner is entitled to a chance to prove his claim; . . ." Id. 1217.

Precisely the same reasoning is urged here by Parks. Hence, it is seen that the substance of the issue deals, not with a distinctive group which in the past has been the target of systematic discrimination, but with matters of *attitude* only. Stated otherwise, Parks complains that *attitudes* which he says would be helpful to him are excluded by virtue of the underrepresentation of young people.

The first issue in such an inquiry must be whether or not there is sufficient proof of sufficiently disparate attitudes within the claimed "cognizable group" to sustain Parks' contention.

The only evidence of a diversity of racial outlook between young and older citizens was the testimony of a sociologist, and, more particularly, the content of a paper which he had written in the year 1977. That paper, in turn, relied upon some Gallup opinion polls, the earliest of which is January 1973, and the latest February 1975. (In his testimony, however, the sociologist indicated that he had reviewed a later Gallup poll — which itself is now five years old.)

Such was the evidence upon which the trial judge based his finding of attitude.

I do not suggest here how such chimerical concerns as public attitudes and divergencies therein properly might be proved. I state without hesitation, however, that it is *not* done with Gallup polls — even when read in open court by a sociologist.

The factual basis for the trial judge's ruling on this issue being insufficient at law, all of the considerations in the majority's Division 6 become unnecessary.

2. I dissent to the holding of the majority in Division 12, and to the concomitant reversal.

First, it needs to be stated at the outset that this is not a "presumption" case. The word "presumption" appears in the charge only as follows: (1) as to the presumption of innocence; (2) as to the presumption of the believability of witnesses; and (3) that "no person will be presumed to act with criminal intention . . . ."

Second, the infirmity for which the majority reverses consists of one sentence, appended by the trial judge to a recharge in the language of OCGA § 16-5-1 (b). It is: "Implied malice is an intention to kill which is proved either by the act of killing itself, the surrounding circumstances, or the absence of any provocation."

Admittedly, the charge would be improved by the omission of this sentence. It *can* be argued that this sentence — standing alone — could equate intent to kill with the act itself. But I suggest that such a conclusion, in the light of reality, is totally unwarranted.

The majority cites *Johnson v. State*, supra, to the effect that "we must first determine what construction a reasonable juror might have placed on the contested charge." 249 Ga. at 622. That standard is set out also, in the case of *Francis v. Franklin*, ___ U. S. ___ (No. 83-1590, decided April 29, 1985). "The question, however, is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning." Opinion, p. 8.

What could a reasonable juror have understood as to the burden of proof in this case? That is the ultimate issue.

The trial court charged the jury as to the presumption of innocence and as to reasonable doubt. It charged as to the "two theories" aspect of circumstantial evidence. It charged that conviction may not rest solely upon mere suspicion, conjecture, or possibility of guilt. It charged that a crime is a violation of a statute which involves a union of act *and* intention, and that a person will not be presumed to act with criminal intention, but the jury may find such an intention to exist upon a consideration of the words, conduct, demeanor, motive, and all other facts and circumstances connected with the act for which the accused is prosecuted.

I suggest that no reasonable juror could conclude anything other than that the state had the burden of proof to establish each and every element of the guilt of the accused beyond a reasonable doubt; that there was no burden upon the accused to establish anything; that intent to kill is an essential element which must be established beyond a reasonable doubt; and that the infelicitous addition of the contested language in no way shifted, nor even lightened, the burden upon the state.

How could a reasonable juror, in this case, fail to understand that the burden of proof as to intention to kill — and as to everything — was squarely upon the state?

In this connection, we need to consider the implications of *Francis v. Franklin*, supra. First, that case is a "presumption" case, unlike this case.

Second, in *Francis*, the defendant was convicted of killing another (who was a stranger) when he fired a projectile through a wooden door. His only defense was accident, in that the slamming of the door by the victim caused the accidental discharge of the handgun. "His sole defense was a lack of the requisite intent to kill, claiming that the killing was an accident." *Francis*, supra, Opinion, p. 1. The facts in the case of Parks are far removed, indeed, from those in *Francis*. A reasonable juror in *Francis* of necessity would be concerned over the sole issue in that case, which was *intent* to kill. Hence, any address to that issue in the charge would have overriding importance.

In this case, by contrast, Parks admitted to the strangulation, rape, and sodomy of a ten-year-old-girl. (Indeed, no substantive question of intent is raised by the evidence.)

In the face of this evidence, and of the repeated instructions by the trial court that the state must prove intent, I inquire again: how could a reasonable juror fail to understand that intent to kill was an essential element of the offense? (And I inquire further: how could a reasonable juror find that Parks' admitted strangulation, rape and sodomy were other than intentional — no matter *what* the charge?)

I am authorized to state that Presiding Justice Marshall and Justice Smith join in this dissent.

<div style="text-align:center">

DECIDED MAY 17, 1985 —
REHEARING DENIED JUNE 11, 1985.

</div>

*Murray F. Bahm, Stephen B. Bright, Robert L. McGlasson II*, for appellant.

*Robert E. Wilson, District Attorney, Susan Brooks, Assistant District Attorney, Michael J. Bowers, Attorney General, Dennis R.*

*Dunn, Senior Attorney,* for appellee.