## 42024. WRIGHT v. THE STATE.
### (335 SE2d 857)

HILL, Chief Justice.

This is a death penalty case.[1] On October 14, 1983, Carolyn Richards and a number of other people were at her apartment in Atlanta. Richards sold liquor and beer at her apartment, and different people came and went. Shortly after midnight on October 15, seven people were there: Richards, Ricky Scott, Taylor Pippins and Alvin Brimidge were at the dining room table playing cards; Ruby Watts, Eugene Beasley, and the victim, Angela Spears, were on stools at. a bar. A man came to the door. Watts went to answer it but would not let him in because she did not recognize him. Richards looked through the peephole and thought she recognized him as someone who had played cards there before. Later she realized that she had never seen him before. Richards let the newcomer in and Watts got him a beer, for which he paid.

Suddenly, the newcomer pulled a .38 caliber revolver from his pocket, fired a shot at Spears, shouted that it was a holdup, and ordered everyone to hit the floor. He then walked over to where Beasley was lying, held the gun to his head, and demanded money. He pulled a second gun, a .22 caliber pistol, and took $82 from Watts. He then robbed Taylor of his wallet, and Richards of her money. He then looked under the table and demanded money from Brimidge, who saw $20 on the floor and picked it up and gave it to him. At that point he tried to leave, but had trouble with the locks on the door. Scott told him to take his time and turn the locks. After he had fled, everyone in the group got up, except Spears. Expert medical testimony established that she died as a result of wounds from a .38 caliber bullet which passed through her left arm into her chest, where it caused internal bleeding, and lodged in her spine.

While Watts called the police, Richards straightened up the apartment. She put beer from the refrigerator in a plastic bag, placed the chairs at the table, and threw away the open beer cans, including the one used by the newcomer. The beer and trash were taken outside, and the discarded cans were never recovered. The police arrived at about 1 a.m. and obtained a description of the perpetrator.

Officers investigating the case learned that Willie Mizell had been at Richards' apartment earlier on the evening of the 14th. He told officers that after leaving Richards' he saw the defendant and loaned

---

[1] The murder occurred on October 15, 1983, and the defendant was convicted and sentenced to death on September 14, 1984. His motion for new trial was filed on September 27, 1984, the transcript was filed on October 29, 1984, and the motion for new trial was overruled on January 18, 1985. The record was docketed in this court on February 6, 1985, and the case was argued orally on May 6, 1985.

him his .38 caliber revolver.[2]

The defendant's picture was included in a nine-picture photographic array assembled by the police and shown to the witnesses at different times within a few days of the shooting and robberies. Five of the six witnesses who were in the apartment selected the defendant as the perpetrator. The sixth selected two pictures, one of which was of the defendant. At trial, five of these witnesses identified the defendant and confirmed that they had selected his picture. The sixth, Eugene Beasley, did not testify.

The defendant presented a witness, Donald Hill, who testified that he was with him almost continuously from 11:30 p.m. on October 14, 1983, until 2 a.m. on October 15, 1983, with the exception of an interval of about five minutes around 1 a.m. Hill testified that he and the defendant were headed to Candy's bar at about 11:30 p.m. when they met two girls and instead went to a party, but after about 15 minutes they left the party and proceeded to Candy's bar, leaving there about 12:45 a.m.

The jury convicted the defendant of malice murder and three counts of armed robbery.[3] The jury also found two statutory aggravating circumstances: "That the offense of murder was committed by a person with a prior record of conviction for a capital felony," OCGA § 17-10-30 (b) (1), a 1977 armed robbery, and "that the offense of murder was committed while the offender was engaged in the commission of another capital felony," OCGA § 17-10-30 (b) (2), and recommended the death penalty.[4] The defendant was sentenced to death for the murder of Angela Spears and to three concurrent life sentences for each of the armed robberies.

1. Having reviewed the evidence in the light most favorable to the jury's determination, we conclude that a rational trier of fact could have found the defendant guilty of the crimes for which he was convicted, malice murder and three armed robberies, beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). In this connection, see Division 6, below. Similarly, the evidence was sufficient for the jury to impose the death penalty upon the aggravating circumstances found.

2. The defendant's first enumeration of error is that the trial court erred in overruling his motion to quash the indictment on the

---

[2] The statement by the officer that Mizell said he loaned the defendant his .38 was elicited by defense counsel on cross-examination.

[3] The defendant was indicted for the armed robberies of Richards, Watts, Brimidge and Beasley. At the close of the state's case-in-chief, the trial court granted a motion for directed verdict of acquittal as to the count of the indictment charging an armed robbery of Beasley.

[4] In connection with this aggravating circumstance, the trial court charged the jury that the capital felonies which the state was relying on were the armed robberies of Richards, Brimidge and Watts.

ground that black males are significantly underrepresented in the grand and petit jury pools. He points out that the pools are chosen from the list of registered voters (supplemented by 81 persons), and that only 63% of eligible black males were registered to vote in Fulton County, whereas 74%, 75% and 73% of eligible black females, white females, and white males respectively, were registered to vote. He concludes that this establishes at least a ten percent disparity between black males and the other denoted groups. We disagree. The figures he is citing, while demonstrating some underrepresentation of black males on the voter's list and hence in the jury pools, do not establish a ten percent disparity as contended.

The proper analysis follows. The evidence showed that there are 87,904 black males over 18 in Fulton County. Since the total population of the county, over 18, is 430,742, black males over 18 constitute 20.4% of the total. There were 4,781 persons in the grand jury pool, of whom 807 were black males. Thus black males constituted 16.8% of the jury pool. The disparity at issue, then, is the difference between 20.4% and 16.8%, or 3.6%. This does not show that black males are unconstitutionally underrepresented.[5] Unified Appeal, 252 Ga. A-13, A-18-21 (1984); see *Ingram v. State*, 253 Ga. 622, 629 (323 SE2d 801) (1984).

3. Defendant contends that the pretrial identification procedures were impermissibly suggestive, resulting in a substantial likelihood of misidentification. The evidence does not support this contention; in fact, there is no evidence that suggests that the pretrial identification was tainted in any way. See *Neil v. Biggers*, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972).

The defendant also complains of the state's use of a photographic array instead of using a lineup. But the state is not required to utilize a physical lineup as opposed to a photographic array. He likewise complains that the trial court erred in so charging the jury, and in not charging on mistaken identification. We have reviewed the court's charge on identification and conclude that it was accurate, fair and complete.

4. As recounted in the facts, Donald Hill testified to an alibi for the defendant; that is, Hill testified that he was with the defendant almost constantly during the time when the crimes were committed. On cross-examination, the prosecutor asked Hill when he first learned that the defendant had been arrested. Hill responded that on October 28, 1983, while he was in Pittsburg, he was told by the defendant's sister that the defendant was in jail on charges of murder and armed

---

[5] In pursuing this analysis, we pretermit the question of whether black males, as distinct from all blacks, are a cognizable group.

robbery, and that the crimes had occurred on the night of October 14. The prosecutor then asked if he went right to the police to report that he had been with the defendant, and Hill said he did not.

When asked whether he had ever told anybody, other than the defendant's trial counsel, about the alibi, before today, Hill testified that he attended the defendant's preliminary hearing but that the defendant's lawyer there, whom Hill could not name or describe, told him he would not call Hill as he was going to wait and see what the outcome of the preliminary hearing would be.

Subsequently, in his closing argument, the prosecutor challenged the credibility of the alibi witness; the defendant contends that the following two paragraphs of his argument involved facts not in evidence and made the prosecutor a witness for the state:

"He then claimed that he went to the preliminary hearing, and he talked to Calvin Wright's lawyer, and he told him about the alibi when they were in front of the judge at a probable cause hearing, and the lawyer said go ahead and take off. And in essence was saying I'm going to let my client rot in jail while the trial (sic) gets cold, so I can't go out and find witnesses to support what you have got to say and prove that my man is innocent.

"He couldn't remember the name of the lawyer. That man should be reported to the Bar Association. He should be disbarred. My Lord, can you imagine blaming it on the lawyer. The mysterious lawyer who never came in here before your hearing and presence and testified and said yes, ladies and gentlemen, that's true, I did tell Mr. Hill to take off. It was not a wise move to do it but I did it. He didn't appear today."

By not objecting to this argument until after the jury had reached its verdict, the defendant waived this objection. *Rivers v. State*, 250 Ga. 303 (7) (298 SE2d 1) (1982); *Mincey v. State*, 251 Ga. 255 (14) (304 SE2d 882), cert. denied, 104 SC 414 (1983). We note, however, that the defendant is not harmed by this waiver because the prosecutor's deductions, although emphatically phrased in his own words, were not illogical. See *Ladson v. State*, 248 Ga. 470 (6) (285 SE2d 508) (1981).

5. The defendant enumerates as error the trial court's refusal to give three charges on circumstantial evidence which he had requested. Two of the three requested charges stated the rule in cases where all of the evidence of guilt is circumstantial. The third requested charge read: "Circumstantial evidence is worth nothing in a criminal case if the circumstances are reasonably consistent with the hypothesis of innocence, as well as the hypothesis of guilt." While the trial judge did not give the requested charges, he did charge the definitions of direct and circumstantial evidence.

The defendant relies on *Julian v. State*, 134 Ga. App. 592 (6)

(215 SE2d 496) (1975), for the proposition that: "[W]here it has become a jury question whether the witness upon whose *direct* evidence the state depends has been impeached, a failure to charge on circumstantial evidence is reversible error." (Emphasis in original.) Contrary to defendant's assertion, however, the witnesses in this case have not been impeached so as to call this rule into play. Cf. *Stanley v. State*, 239 Ga. 260 (1) (236 SE2d 611) (1977) (co-indictee who gave the only direct evidence against the defendant impeached by his prior inconsistent statements exonerating the defendant). Likewise, the fact that the defendant was a stranger to the witness does not render their identification of him circumstantial evidence. *Ward v. State*, 233 Ga. 251 (210 SE2d 772) (1974); OCGA § 24-1-1 (3), (4). Thus the trial court did not err in not giving the requested charges. *Stevens v. State*, 245 Ga. 583, 584 (266 SE2d 194), cert. denied, 449 U. S. 891 (1980).

6. The defendant contends that he "was denied a fair trial because of the court's failure to define 'malice aforethought,' as charged in the indictment." He relies on *McKeever v. State*, 118 Ga. App. 386 (163 SE2d 919) (1968), wherein the defendant had been tried for murder and convicted of voluntary manslaughter. In dealing with a contention that evidence of a prior incident was erroneously admitted, the court stated: "Here, in a trial under an indictment for murder, it was essential, in order to convict for this offense, for the State to prove malice aforethought, i.e., a preconceived intention to kill without justification or excuse present when the acts occurred. . . ." Id. at 388. While Wright did not request a charge giving this definition of malice aforethought, he did object to the charge given on the ground that it did not define that term. On appeal, he contends that the trial court erred in not charging the definition of malice aforethought stated in *McKeever*, supra.

We find no error. Georgia law does not require premeditation. *Andrews v. State*, 254 Ga. 498, 499 (330 SE2d 873) (1985). Similarly, it does not require a "preconceived" intention to kill. The trial court instructed the jury as to the statutory definition of express and implied malice, OCGA § 16-5-1, and as follows: "No particular length of time is required for malice to be generated in the mind of the slayer. It may be formed in a moment and instantly a mortal blow may be given or a fatal shot fired; yet, if malice is in the mind of the slayer at the time of the doing of the act or killing and moves him to do it, it is sufficient to constitute the homicide murder." This instruction was a correct statement of the law. *Brown v. State*, 190 Ga. 169 (2) (8 SE2d 652) (1940).

The foregoing disposes of defendant's enumerations of error relating to his guilt/innocence trial. His convictions are therefore affirmed.

7. The defendant enumerates as error the trial court's failure to grant two motions for a mistrial made during the sentencing phase of trial. We need address only one of these.

During the sentencing phase, the defendant called his father as a witness. On direct, the father testified that his son lived at home and worked for a construction company, giving part of his pay to his mother, except when he was locked up. The father was then cross-examined by the state as follows:

"Q. Hello, Mr. Wright. You and I have met before, haven't we, sir?

"A. I believe so.

"Q. Remember back in April of 1983 you were in this courtroom, weren't you, sir?

"A. I don't remember.

"Q. Do you remember you were testifying and I was talking to you about that Cadillac that came up?

"A. Yes.

"Q. Do you remember what that case was all about that Calvin was charged with?

"A. I can't remember because since then—

"Mr. Wolfe: I object to this, your honor. I don't recall anything in evidence regarding anybody being in court in April of 1983. I will object to Mr. Jensen going into that.

"The Court: I overrule the objection. You may proceed.

"Q. (By Mr. Jensen) Do you remember what we were in court about? What Calvin was charged with when you testified about the Cadillac?

"A. Yes, I remember that.

"Q. What was the charge?

"A. I can't remember what the charge was because this is why I can't remember it because I had a prostate operation since then, just in December, and my mind don't reflect on a whole lot of things.

"Q. Was it for armed robbery? Do you recall it being for armed robbery?

"Mr. Wolfe: I object, again. The man has testified on cross-examination to the district attorney's leading question that he does not remember.

"Mr. Jensen: He just testified he believes it was armed robbery.

"Mr. Wolfe: He testified he didn't know. Maybe Mr. Jensen can suggest another crime or something else that may or may not be true to the witness.

"The Court: I overrule the objection. If you're trying to point out in the witness' mind some particular period of time, you may proceed.

"Q. (By Mr. Jensen) Do you remember seeing your son shortly after that trial? Do you remember seeing him come back home?

"A. I'm trying to think now. He came back home, I believe.

"Q. Do you remember how long it was after he came back home that he got locked up again?

"A. I really can't remember how long it was. What I'm trying to say —

"Q. It wasn't very long?

"A. It wasn't very long. I don't think. What happened, see, my condition has affected my remembrance a lot. I have been going along with this off and on about 6 years until the operation. After the operation it got worse, but what I'm saying now is what I can remember. I don't mind telling you that. But that ain't too much now that I can remember.

"Mr. Jensen: Thank you very much."

The defendant says in his brief that he was tried by the same prosecutor in April of 1983, that his father testified, and that the trial ended in a mistrial. He contends, however, that the prosecutor's line of questioning amounted to "testifying for the state on matters not in issue and placing matters not in evidence before the jury by his statements." We agree. The prosecutor was not attempting to impeach the witness as to anything the witness had said on direct examination.

During the sentencing phase of a death penalty trial, the jury may hear evidence as to defendant's record of prior convictions, pleas of guilty, and nolo pleas (or the absence thereof) which the state has made known to the defendant prior to trial. OCGA § 17-10-2 (a) (c). In this case the state gave the defendant notice that it would rely upon the defendant's May 1975 plea of guilty to two counts of burglary and one of robbery, and his July 1977 conviction for armed robbery. The state's notice made no mention of an April 1983 conviction, plea, or crime of any sort. Thus, it was error to overrule defendant's objections to questions concerning the April 1983 trial, whether it resulted in a mistrial or a conviction.

We thus turn to the question of harm. By his questions, the prosecutor informed the jury that the defendant had been tried in April 1983 for an armed robbery involving a Cadillac, and returned home thereafter (whether the jury may have thought he was placed on parole, or what, we cannot ascertain). The jury was also apprised that shortly after returning home following the April trial, the defendant was locked up again (presumably for the October 1983 murder and armed robberies).

The jury had been made aware of the defendant's prior record of guilty pleas and conviction in 1975 and 1977. The fact that the defendant had been tried for another armed robbery might or might not unduly influence the jury except for the time element. The jury also knew that in 1975, the defendant served 8 months under the Youthful Offender Act, and that in July 1977 he had been sentenced to serve

ten years for armed robbery. The jury also learned, erroneously, that in April 1983 he was tried for an armed robbery involving a Cadillac. In October 1983 he committed the crimes involved in this case. The jury could have concluded that the death penalty was warranted because the defendant was an habitual armed robber.[6] Because the admission of evidence as to the April 1983 trial for armed robbery would have contributed to this conclusion, we cannot find that its admission was harmless error. For this reason, the death penalty must be vacated and the defendant given a new trial as to the sentence to be imposed.

*Convictions affirmed; death penalty vacated. All the Justices concur.*

DECIDED OCTOBER 30, 1985.

*L. David Wolfe,* for appellant.

*Lewis R. Slaton, District Attorney, Chris Jensen, Assistant District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn, Staff Assistant Attorney General,* for appellee.

---

[6] The jury imposed the death penalty based upon the defendant's 1977 armed robbery conviction.