A97A2534. BALLENGER PAVING COMPANY v. GAINES.
(499 SE2d 722)

BEASLEY, Judge.

While observing the use of his employer's saw blades at a road construction site, Timothy Gaines was struck by an automobile that invaded the site. Gaines sued the general contractor, Ballenger Paving Company, for inadequate traffic control at the site. A jury awarded Gaines $2.7 million. Ballenger unsuccessfully moved for a directed verdict and for judgment notwithstanding the verdict, arguing that the intrusion of the automobile, driven by a drunk driver, was an unforeseeable intervening criminal act.

The issues on appeal are (i) whether the driver's actions were the sole proximate cause of the accident; (ii) whether Gaines was a licensee on the site and as such not entitled to recover absent a showing of

wilful and wanton misconduct; (iii) whether Ballenger was entitled to a directed verdict on Gaines' claims that Ballenger should have closed the entrance ramp, used overhead floodlights, or used a crash truck; (iv) whether the evidence demanded a finding that Gaines had equal knowledge of the traffic control measures; (v) whether the jury array was illegally constructed; and (vi) whether the trial court erred in admitting into evidence the Manual on Uniform Traffic Control Devices.

1. *Proximate cause and Breach of duty.*

Ballenger first argues it "was entitled to a directed verdict and judgment notwithstanding the verdict because viewing the evidence in the light most favorable to the plaintiff, the true proximate cause of this accident was Alan Brownley's criminal act of driving under the influence of alcohol and crashing through a clearly delineated barricade after disregarding warning signs." In its third enumeration of error, Ballenger argues that the court should have directed a verdict on Gaines' claims that Ballenger was negligent in failing to close the entrance ramp leading up to the construction site, in failing to use floodlights, and in failing to use a crash truck. Although the first enumeration relates to proximate cause and the third relates to breach of duty, both ignore evidence to the contrary.

A directed verdict or j.n.o.v. should only be granted "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict . . . ."[1] " 'Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of [Ballenger's] motion for directed verdict . . . and j.n.o.v. will not be disturbed.' [Cit.]"[2]

(a) So construed, the evidence showed that the driver, Brownley, was not intoxicated and that his negligence in not seeing the barrels was a reasonably foreseeable consequence of Ballenger's actions in failing to follow recognized standards of conduct in traffic control.

Shortly after 11:00 p.m. Brownley left a party where he drank beer and consumed pizza, a hot dog, and some chips. He drove his

---

[1] OCGA § 9-11-50 (a).

[2] *Hutcheson v. Daniels*, 224 Ga. App. 560 (481 SE2d 567) (1997); see *Dept. of Transp. v. Blair*, 220 Ga. App. 342, 343 (1) (469 SE2d 446) (1996).

vehicle up the Washington Road on-ramp to I-20. As he looked over his left shoulder to view the traffic with which he intended to merge, he did not see the signs or reflective barrels on the entrance ramp channeling traffic to make a hard left turn to cross over the right lane of I-20 and merge into the only lane of I-20 open (the left lane). He drove through the plastic barrels and struck Gaines.

(1) Ballenger's negligence.

The right lane and the entrance ramp were the site of road reconstruction. Ballenger had contracted with the Department of Transportation to replace the paving and had subcontracted Eaton Construction Company to saw the old paving into squares which Ballenger would remove and replace with new paving. Eaton purchased diamond blades from Norton Construction for the sawing. Eaton invited Norton's representative, Gaines, to visit this worksite to field test new blades that might be faster and more effective with the particular type of paving at that site. When Gaines arrived, he notified Ballenger of his presence.

The site that night was very dark because Eaton did not like to use the floodlights mandated by its subcontract for the protection of people working at the site. By contract and by law,[3] Ballenger was responsible for providing adequate traffic control at the site. Even though Ballenger informed Eaton the lack of floodlights was a safety problem for site workers, Ballenger allowed Eaton to use only a small light on the saw.

Ballenger's contract with the DOT also required the barrels serving as channelization devices to have steady burning lights, but on this night only two of the barrels at most had working lights. This may have confused drivers into thinking there was an open thoroughfare between them. This lighting also violated the Manual for Uniform Traffic Control Devices (MUTCD), which is not only the recognized minimum standard for the industry for traffic control devices,[4] but was incorporated into the DOT contract for the purpose of protecting both the public and the workers at the site.[5] Negligence claims for failure to provide adequate lighting at road construction sites are not uncommon.[6]

---

[3] See *Brown v. Atlanta Gas Light Co.*, 96 Ga. App. 771, 777 (2) (101 SE2d 603) (1957) (" 'A contractor constructing a road or bridge owes a duty to the public to exercise ordinary care to protect it from injuries arising by reason of such construction' ").

[4] OCGA § 32-6-50 (a); *Dept. of Transp. v. Brown*, 267 Ga. 6, 8 (2) (471 SE2d 849) (1996) (MUTCD is generally recognized source of traffic control standards).

[5] See *Blair*, supra, 220 Ga. App. at 343 (violation of MUTCD is negligence).

[6] See, e.g., *Turkett v. Central of Ga. R. Co.*, 117 Ga. App. 617, 618-619 (1) (161 SE2d 362) (1968) (unlighted warning sign); *Brown*, supra, 96 Ga. App. at 777 (failure to place barricades, torches, red flags or other warning devices); *Trammell v. Matthews*, 84 Ga. App. 332, 338 (1) (66 SE2d 183) (1951) (failure to provide proper barricades, lighted signs and warnings at road block); see also *Mathis v. Nelson*, 79 Ga. App. 639, 641 (1) (54 SE2d 710) (1949) (unlit tractor).

Beyond the lighting problems, Ballenger failed to follow the recommended procedure for providing an adequate taper lane for merging traffic. At the posted 45 mph speed limit on the ramp, the taper should have been 1,350 feet long, whereas it was only 104 feet. The industry formula for this short length mandated a speed limit of only four mph, but no speed limit under forty-five was posted. Ballenger maintained that the physical characteristics of this site prevented the longer taper required by the MUTCD. Accordingly, an expert witness testified that the ramp should have been completely closed to traffic during the four nights that work occurred. Ballenger claimed that such would have been too disruptive to traffic flow, but conceded that it had recommended such a lane closure to the DOT, and that on at least one night the lane was actually closed for Ballenger's work. Two years after the construction, Ballenger and its expert witness went to the site to set up barrels as they were arranged on the night of the accident. Ballenger found it necessary to close down the ramp for the safety of people at the site.

The expert also testified that the unlit signage leading up to the construction site was inadequate per industry standards. Other witnesses testified that the sharp left turn into the fast lane of I-20 was difficult and dangerous, and that immediately following the accident Ballenger placed the barrels at a softer angle. A water truck on site could have been used as a crash barrier as was done on other sites, but Ballenger refused to provide the manpower for such.

(2) Brownley's intoxication.

Despite the evidence of negligence, Ballenger argues that the true proximate cause of the accident was Brownley's inebriation, and that even if the lighting and other traffic control had been done, or even if the lane had been closed, Brownley in his alcohol-influenced state would have not seen anything and would have crashed through the barricade regardless. Ballenger emphasizes the findings of a test showing Brownley had a blood-alcohol level of .13 grams about one-and-one-half hours after the accident, which exceeded the legal limit for driving.[7]

This argument assumes the evidence was undisputed Brownley was intoxicated. This is not so. Brownley testified he was not intoxicated, and the first two people to speak face-to-face with Brownley within minutes after the accident testified he exhibited no symptoms of intoxication and they smelled no alcohol. After the accident Brownley ran to get help, which one defense witness testified was consistent with sobriety. The defense toxicologist admitted that eating a heavy starchy meal would delay the absorption of alcohol up to

---

[7] OCGA § 40-6-391 (a) (5).

three hours, and therefore the blood alcohol level may have been less than .13 at the time of the accident.

Ballenger's citations to cases holding that intervening unforeseeable criminal acts may break the chain of causation are therefore irrelevant.[8] The jury, which also entered the verdict against the defaulting Brownley, may have found that Ballenger was negligent in not closing the ramp or in not having proper lighting or taper length and that Brownley was negligent in failing to maintain a proper lookout. Looking over one's shoulder to prepare to merge can be expected on a freeway entrance ramp.[9] While Brownley's failure to discern the unlit construction site surrounded by unlit reflective barrels may have been negligent, it was also foreseeable. The stated purpose of requiring such lighting was to protect workers from passing motorists.

" 'If the original negligent actor reasonably could have anticipated or foreseen the intervening act and its consequences, then the intervening act of negligence will not relieve the original actor from liability for the consequences resulting from the intervening act. That is a jury question.' [Cits.]"[10] "Clearly there can be more than one proximate cause of an accident. . . ."[11]

*Watson v. Marshall*,[12] cited by Ballenger, is distinguishable. In *Watson* a driver in dense fog did not see various signs as she exited I-85 onto I-185 and turned sharply to the left to proceed in the wrong direction, resulting in a collision. "Assuming DOT did something negligent, we have said before that where a person is engaged in potentially dangerous conduct and does not know what he is doing but forges ahead to do it anyway, it cannot be reasonable, proper or warranted to do it. [Cit.]"[13] Brownley could reasonably have expected the road ahead of him to be clear as he looked over his shoulder to discern the merging traffic.

---

[8] See, e.g., *Brown v. Mobley*, 227 Ga. App. 140 (488 SE2d 710) (1997) (physical precedent only).

[9] See *Mathis*, supra, 79 Ga. App. at 642-643 ("A motorist upon the public highways of this State has a right to assume that the road ahead of him is clear of structural obstructions").

[10] *Blair*, supra, 220 Ga. App. at 344 (1) (b); see *Smith v. Commercial Transp.*, 220 Ga. App. 866, 867 (1) (470 SE2d 446) (1996) (one who is negligent in obstructing a roadway is not relieved of liability by the negligence of a motorist encountering the obstruction); *Schernekau v. McNabb*, 220 Ga. App. 772, 774 (470 SE2d 296) (1996) (even criminal acts will not break the proximate cause chain if they are foreseeable). Compare *Southern Bell Tel. &c. Co. v. Dolce*, 178 Ga. App. 175, 176-177 (1) (342 SE2d 497) (1986) (merely furnishing a non-dangerous condition creates no liability for damages caused by an unforeseeable negligent act).

[11] *Smith*, supra, 220 Ga. App. at 867.

[12] 212 Ga. App. 206 (441 SE2d 427) (1994).

[13] *Watson*, supra, 212 Ga. App. at 208 (2).

(b) Ballenger points out that Gaines originally pled that Brownley was intoxicated and that this caused the accident. Ballenger argues that because Gaines did not formally withdraw these allegations, Gaines cannot now claim that Brownley was sober, even though there was evidence of his sobriety introduced at trial.

A party is bound by material allegations made in his pleadings so long as they remain in his pleadings, and he will not be allowed to disprove an unwithdrawn admission made in them.[14] But the process of dispute resolution by litigation does not end the matter there. "[B]y admitting the evidence [at trial] and allowing the factfinder to consider it, the trial court has in effect, either sua sponte or by overruling an opposing motion, tacitly permitted the pleading party to withdraw the admission contained in the pleadings."[15] Where the pleadings are deemed amended, "the admission contained therein remains to be utilized as evidence of fact which the admitting party can explain but may be unable to conclusively refute. [Cits.]"[16]

Prior to trial Gaines moved in limine to exclude evidence of Brownley's nolo contendere plea on the charge of driving with a blood-alcohol level over the legal limit. Counsel for the DOT (a codefendant) argued that the complaint alleged Brownley was driving under the influence and that Gaines was now taking a different position. The court ruled that although the circumstances of the plea would be admissible, Gaines could explain it or present other evidence on intoxication. No one objected to this ruling. Gaines presented three witnesses who testified Brownley was not intoxicated. Ballenger did not object to this testimony, but only noted during its directed verdict argument that Gaines had changed his position from his original pleadings. In the court's charge to the jury, it noted that although Gaines had originally alleged Brownley was intoxicated, Ballenger was now the party contending such.

Thus, the court implicitly if not expressly allowed Gaines to withdraw the admissions, and the jury was properly allowed to consider the admissions and the evidence contradicting them.

2. *Plaintiff as licensee.*

In its second enumeration, Ballenger contends Gaines was a licensee as to Ballenger, who breached no duty to avoid wilfully and wantonly injuring him. Under premises liability law, an occupier of land must exercise ordinary care in keeping the premises and

---

[14] *Walker v. Jack Eckerd Corp.*, 209 Ga. App. 517, 519 (1) (434 SE2d 63) (1993).

[15] *Walker*, supra, 209 Ga. App. at 520; see *Aycock v. Calk*, 228 Ga. App. 172, 173 (491 SE2d 383) (1997) ("trial court [can] treat such evidence as amending the pleadings").

[16] *Strozier v. Simmons U.S.A. Corp.*, 192 Ga. App. 601, 603 (385 SE2d 677) (1989); see OCGA § 24-3-30.

approaches safe as to invitees.[17] As to licensees, the occupier is liable only for wilful or wanton injury.[18]

It is questionable whether premises liability law applies to contractors in public road construction projects.[19] If not, then Ballenger owed Gaines "a duty of 'ordinary care' or reasonable care under the circumstances. OCGA § 51-1-2."[20] " 'A contractor constructing a road or bridge owes a duty to the public to exercise ordinary care to protect it from injuries arising by reason of such construction. (Cits.)' [Cit.]"[21]

If premises liability law applies, Ballenger's argument still fails. "To determine whether a person is an invitee or a mere licensee, the nature of his relation or contact with the owner or occupier of the premises must be determined. The test is whether the injured person at the time of the injury had present business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence on the premises was for his own convenience. There must be a mutuality of interest in the subject to which the plaintiff's business related, even if the subject of the business is not for the benefit of the defendant. An invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it."[22]

Ballenger and Gaines both had an interest in the effectiveness of the saw blades being used by Eaton. Eaton was authorized to invite Gaines to the project site, which it did.[23] Gaines checked in with Ballenger before going on-site. The project was behind schedule, and Ballenger stood to gain if better saw blades could accomplish the job more quickly. Ballenger had often allowed saw blade representatives on its job sites (including when Eaton was the sub-contractor) to perform such field tests.[24] Gaines wanted to field test the saw blades so he could sell more or better blades to his customer, Eaton. The field

---

[17] OCGA § 51-3-1.

[18] OCGA § 51-3-2 (b); *Lee v. Myers*, 189 Ga. App. 87, 88 (1) (374 SE2d 797) (1988).

[19] See *Gleaton v. APAC-Georgia*, 228 Ga. App. 52, 54 (491 SE2d 138) (1997); *Powley v. Precision Plumbing Co.*, 222 Ga. App. 848, 850 (2) (476 SE2d 777) (1996).

[20] *Powley*, supra, 222 Ga. App. at 850 (2).

[21] *Gleaton*, supra, 228 Ga. App. at 54 (2).

[22] (Citations and punctuation omitted.) *Atkins v. Tri-Cities Steel*, 166 Ga. App. 349, 350 (304 SE2d 409) (1983).

[23] See generally *Davis v. Garden Services*, 155 Ga. App. 34, 35 (1) (270 SE2d 228) (1980) ("The guests of . . . tenants, those coming on the leased premises for business purposes beneficial to the tenant, and those doing business with him are there by his invitation and stand in his shoes insofar as they suffer injury due to the negligence of the owner or occupier of the premises"); *Brown v. Clay*, 166 Ga. App. 694, 695 (305 SE2d 367) (1983) (same).

[24] See *Wade v. Polytech Indus.*, 202 Ga. App. 18, 24 (4) (413 SE2d 468) (1991) (an implied invitation results when owner permits something to be done on the property consistent with the business purposes of the owner).

testing being done by Gaines could be found to be a common interest of Ballenger and Gaines, even if it was not for the direct benefit of Ballenger.[25] Licensee cases cited by Ballenger are factually dissimilar.[26] The jury was instructed on what constitutes a licensee and an invitee, and since there was some evidence to support a finding of invitee, we are not authorized to disturb the jury's verdict on appeal.

3. *Equal knowledge.*

The fourth enumeration is that the inadequate traffic control was so open and obvious that the court should have held as a matter of law that Gaines had equal knowledge of it. "Even if a defendant is negligent, a determination that a plaintiff assumed the risk or failed to exercise ordinary care for [his] own safety bars recovery for the resulting injury suffered by the plaintiff, unless the injury was wilfully and wantonly inflicted. A plaintiff is held accountable for the failure to exercise due care for personal safety when doing an obviously dangerous act, and that failure is regarded as the sole proximate cause of the injury."[27] Unless the plaintiff's knowledge is clear and palpable, the issue of exercising diligence for his own safety is a question for the jury.[28]

Gaines, who had no training in road enclosures, testified, "I don't want to even lead anybody to that conclusion that I know anything about traffic control." He had not been to the site before and did not see the traffic control devices. Nor did he drive the ramp coming from Ballenger's office site on Belair Road when he checked in. This evidence raised the inference that he did not see the inadequate signs, the non-functioning channelization lights, or the short length of the ramp taper, and that he did not have opportunity to understand or appreciate the increased risk created by the combination of these conditions so as to be prompted to reduce speed and change course. A jury could also find Gaines reasonably relied on Ballenger for safe traffic control. It was not error to refuse a directed verdict on this issue.

4. *Jury array.*

Fifth, Ballenger enumerates as error the overruling of its challenge to the jury array. Ballenger claimed Richmond County had ille-

---

[25] See *Atkins*, supra, 166 Ga. App. at 350.

[26] See *Strickland v. ITT Rayonier*, 162 Ga. App. 317 (1) (291 SE2d 396) (1982) (contract specifically defined relationship as that of licensee); *Chambers v. Peacock Constr. Co.*, 115 Ga. App. 670, 676-677 (4) (155 SE2d 704) (subcontractor had no mutual interest with vendor visiting general contractor), aff'd, 223 Ga. 515 (156 SE2d 348) (1967); *Pafford v. J. A. Jones Constr. Co.*, 9 SE2d 408 (N.C. 1940) (visitor had no sales or contract relationship with either the subcontractor or the contractor).

[27] (Citations omitted.) *City of Winder v. Girone*, 265 Ga. 723, 724 (2) (462 SE2d 704) (1995).

[28] *Brown v. Carlisle*, 214 Ga. App. 483, 484 (448 SE2d 256) (1994).

gally revised its jury list in the fall of 1996 by replacing 1,933 names (which had become ineligible because of age, medical reasons, non-residence, or felony convictions) with eligible names. The latter consisted primarily of newly-registered voters, most of whom were between the ages of 18 and 24. As a result, more than 50 percent of Ballenger's array consisted of persons 18 to 24 years old and only 17 percent were older than 35. Following selection, the jury consisted of four 20-year-olds, one 21-year-old, two 22-year-olds, a 26-year-old, a 28-year-old, two jurors over 35, and one juror who did not state his age.

Ballenger complained of an underrepresentation of persons 35 and older and moved to have the entire array stricken. The court conducted an evidentiary hearing, during which Ballenger presented two witnesses, both of whom served or had served as the Richmond County jury clerk. They explained the name replacements and testified that this strictly followed the judicially established Richmond County jury plan. The court denied the motion.

(a) Ballenger first argues the jury list was illegally revised to add the 1,933 names, for OCGA § 15-12-40 (a) (3) prohibits adding names until the list is completely exhausted or until a revised list has been properly created. But OCGA § 15-12-40 (a) (3) only applies to jury lists created by nonmechanical procedures, and the jury list of Richmond County was created by electronic means.

OCGA § 15-12-40 (b) applies, which in subsection 2 provides: "Once the trial or grand jury lists, or both, are established, the board of jury commissioners may revise such lists from time to time by adding new names to the lists, correcting names and other data on the lists, and deleting names from the lists by reason of death or other legal cause." The replacement of the 1,933 ineligible names with eligible names was lawful.

(b) Ballenger's second argument is that OCGA § 15-12-40 (a) (1), which applies to lists electronically created pursuant to certain court-established plans as here,[29] requires the board of jury commissioners, in composing the trial jury list, to "select a fairly representative cross section of the intelligent and upright citizens of the county." Ballenger contends the infusion of the 1,933 names consisting primarily of 18 to 24-year-olds skewed the jury list unfairly.

A party challenging a jury array must show the underrepresented group is distinct or cognizable.[30] Claiming significant overrepresentation of those under 25 (and concomitant underrepresentation of those 25 and older), the defendant in *Anthony v. State*[31] failed

---

[29] See OCGA §§ 15-12-40 (b) (1); 15-12-42 (b).
[30] *Anthony v. State*, 213 Ga. App. 303, 305 (2) (444 SE2d 393) (1994).
[31] Supra, 213 Ga. App. at 303.

under similar circumstances to meet his burden. The analysis in *Anthony* applies here.

"To show that a group is distinct or cognizable under the sixth amendment, a defendant must show: (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. Although earlier Georgia Supreme Court cases stated that age is not a recognized class for purposes of jury representation, subsequent cases have held that whether age is a cognizable class for jury selection purposes is a question of fact which will depend in each case upon such factors as the time and location of trial. At least one trial court has found young people (18 to 29-year-olds) to be a cognizable group. . . . See *Parks*[ *v. State*, 254 Ga. 403], 409-410 [(330 SE2d 686) (1985)]. Unlike the defendant in *Parks*, however, defendant here failed to produce evidence of common attitudes and values on the part of the alleged group. Nor did [it] show that the group had a definite composition; indeed, defendant argued at some points . . . that the overrepresented group was 18 to 24-year-olds and in others that it was 18 to 2[0]-year-olds. Moreover, defendant's argument ignores the fact that the group of 18 to 24-year-olds are *over* rather than underrepresented. Thus, even if those under 24 are shown to be a distinct and cognizable group for jury selection purposes, those 25 and older clearly are not, and they — the underrepresented group — are the pertinent group in this analysis. Accordingly, defendant failed to establish that a cognizable group was significantly underrepresented in [its] array, and the trial court did not err in rejecting [its] challenge."[32]

Ballenger has also "failed to show why young adults 18 to 24 were included within [its] grouping and those 18 to 25, 29, or some other age were not."[33] As in *Spivey v. State*,[34] Ballenger simply "made no attempt" to show any particular age group was cognizable other than a parting statement in its reply brief that persons under 21 are not allowed to drink alcohol[35] and that this case involved an issue of drinking and driving. But none of Ballenger's statistics showed that those 21 years old and older were underrepresented on the array, and Ballenger presented no expert testimony about the characteris-

---

[32] (Citations and punctuation omitted.) *Anthony*, supra, 213 Ga. App. at 305-306 (2).
[33] *Potts v. State*, 259 Ga. 812, 813 (1) (388 SE2d 678) (1990).
[34] 253 Ga. 187, 199 (7) (a) (319 SE2d 420) (1984).
[35] OCGA § 3-3-23.

tics of this group.[36] Failure to show a cognizable group dooms the challenger.[37]

5. *Manual as evidence.*

The sixth enumeration addresses the Manual for Uniform Traffic Control Devices as evidence. In a pretrial hearing, defendants had unsuccessfully moved to exclude the manual, arguing it was nothing more than a treatise whose information should come from the witness stand and should not go out with the jury as an exhibit. The manual was admitted as an exhibit, and the plaintiff's expert, the DOT expert, and the DOT representative testified to its standards and contents. On appeal, Ballenger claims this "effectively put written testimony into the jury room, unduly emphasizing the testimony of Gaines' expert at great harm to the appellant."

At least two reasons undermine the claim.

First, Ballenger's contract with the DOT, which was stipulated into evidence by all parties, expressly incorporated the manual into its terms. As a part of a contract already admitted into evidence, the manual was also admissible to complete the picture of the contract requirements.

Second, *Isom v. Schettino*[38] held the court erred in excluding this manual in a negligence case concerning traffic controls. In other traffic control device cases the court has expressed concern when the manual is not introduced into evidence.[39] Admission of the manual was not error.

*Judgment affirmed. McMurray, P. J., and Smith, J., concur.*

DECIDED MARCH 12, 1998 —
RECONSIDERATION DENIED MARCH 25, 1998

*Fulcher, Hagler, Reed, Hanks & Harper, David P. Dekle,* for appellant.

*Burnside, Wall, Daniel, Ellison & Revell, Thomas R. Burnside, Jr., James W. Ellison, L. Matt Wilson,* for appellee.

---

[36] See *Parks,* supra, 254 Ga. at 409-410 (6) (b).

[37] See *Wellons v. State,* 266 Ga. 77, 90-91 (29) (463 SE2d 868) (1995) (no showing "excluded age groups are distinct and cognizable"); *Henry v. State,* 265 Ga. 732, 734-735 (3) (a) (462 SE2d 737) (1995) (no showing college students were cognizable group); *Bright v. State,* 265 Ga. 265, 283 (12) (455 SE2d 37) (1995) (no showing 18 to 30-year-olds were cognizable group); *Mincey v. State,* 251 Ga. 255, 262 (7) (304 SE2d 882) (1983) (no showing 18 to 23-year-olds were cognizable group).

[38] 129 Ga. App. 73, 77 (1) (199 SE2d 89) (1973).

[39] See *Blake v. Continental S.E. Lines,* 161 Ga. App. 869, 873, fn. 1 (289 SE2d 551) (1982); *Maxwell v. State,* 97 Ga. App. 334, 339 (4) (103 SE2d 162) (1958).