[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14801

_____

D.C. Docket No. 3:13-cv-00191-MCR-CJK

LNV CORPORATION,

Plaintiff-Appellant,

versus

BRANCH BANKING AND TRUST COMPANY,

Defendant- Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 11, 2018)

Before MARCUS and NEWSOM, Circuit Judges and BUCKLEW,[*] District
Judge.

PER CURIAM:

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida,
sitting by designation.

**I**

This case features a contract dispute between two companies that entered into a "participation agreement."  In a traditional participation agreement, a "lead" bank loans money to a borrower and then sells a piece of the loan to a "participant" bank.  Here, a lead bank loaned money to finance a Florida real-estate venture in 2005, and a participant bank joined 23.08% of the action via a participation agreement.  The collapse of the real-estate market in the late 2000s wiped out the original parties to the agreement and sank the venture itself, pushing the borrowers into default.  In 2009, our appellee Branch Banking and Trust Company ("BB&T") acquired the lead bank's portfolio, which included two loans—the "Owls Head" loan and the "JLD" loan—both of which financed portions of the defunct real-estate development.  At around the same time, appellant LNV Corporation acquired the 23.08% participant's share in the Owls Head loan for $197,345, thus placing BB&T and LNV in the agreement's lead-participant relationship vis-à-vis the Owls Head loan.

As lead, BB&T immediately sued the defaulted Owls Head borrowers and guarantors, seeking to recover the value of the loans.  During the litigation, the value of collateral underlying both loans dropped dramatically, and BB&T accordingly charged down the loans' book values.  The Owls Head loan had a book value of $16.2 million when BB&T acquired it in May 2009, but by July

2

2011 BB&T had charged it down to $1.47 million.  Similarly, the JLD loan had a book value of $5.9 million in August 2010, but in June 2011 BB&T charged it down to $2.48 million.

At a court-ordered mediation in August 2011, Douglas Duncan—an original Owls Head guarantor who was personally liable on the loan—and BB&T agreed to assign both the JLD and Owls Head loans to one of Duncan's companies for $10 million.  This transaction between BB&T and Duncan effectively dissolved the loans, terminating the rights of those who had previously held an interest in them—that is, BB&T and LNV—against Duncan.  Of this $10 million settlement, BB&T unilaterally—and LNV says suspiciously—allocated $2.5 million to the Owls Head loan, which had $34.6 million outstanding, and $7.5 million to the JLD loan, which had $9.6 million outstanding.  These figures resulted in a 7.2% recovery on the Owls Head loan, of which LNV owned 23.08%, and a 78.3% recovery on the JLD loan, which BB&T owned alone.  The loans' book values—trading at roughly 50% discounts when BB&T acquired them in 2009—had since diverged even further from their face values; according to BB&T's analysis, the Owls Head loan was worth $1.47 million while the JLD loan was worth $2.48 million.[1]

_____

[1] In defending what appeared to be disproportionate allocations—particularly relative to the loans' respective face values—BB&T has consistently maintained that the division reflected the

Shortly after the August mediation, BB&T informed LNV of Duncan's $2.5 million offer for the Owls Head loan, but did not disclose the total $10 million settlement amount, the allocation, or the fact that it had already reached an agreement with Duncan to settle the lawsuit.  In September 2011, LNV rejected Duncan's settlement offer.  Nevertheless, the following month, BB&T informed LNV that it intended to accept Duncan's offer, and in November, BB&T and Duncan closed on the sale and assignment of the loans.  Once it received the funds, BB&T promptly forwarded to LNV $577,000—23.08% of the $2.5 million purchase price allocated to Owls Head.  LNV sued BB&T in September 2012, asserting that BB&T had breached the participation agreement—in particular, by materially changing the loans' terms without LNV's consent—and thereby harmed LNV.

Following a bench trial, the district court held that although BB&T had breached the agreement, LNV "failed to prove damages on the breach of contract claim."  The court thus awarded LNV zero damages (and separately denied LNV's

---

fact that the collateral securing the JLD loan had a higher value than that securing the Owls Head loan and that the JLD litigation was less complex than the Owls Head litigation.

request for attorneys' fees).  LNV timely appealed to this Court.  We affirm, largely for the reasons explained by the district court.[2]

## II

LNV presents a panoply of issues and arguments on appeal, all of which revolve around one central contention:  that the district court erred in awarding LNV no damages.  Despite the participation agreement's complicated nature, we agree with the district court that the case is resolvable by reference to fundamental tenets of contract law.

By its terms, the participation agreement is "governed by, and [is to be] construed in accordance with, the law of the State of Georgia."  It is hornbook law in Georgia, as elsewhere, that in order to recover damages for breach of contract, a plaintiff must separately prove both breach and damages.  *See Simmons v. Boros*, 335 S.E.2d 662, 663 (Ga. Ct. App. 1985), *aff'd*, 341 S.E.2d 2 (Ga. 1986) (explaining that plaintiff must show "*both* the breach and the damage") (emphasis in original); *see also Norton v. Budget Rent A Car System, Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right

---

[2] BB&T cross-appealed, asking us to reverse the district court's determination that BB&T breached the agreement.  Because the district court's breach ruling was not necessary to its decision in BB&T's favor, it has no preclusive effect, *See Bobby v. Bies*, 556 U.S. 825, 835 (2009).  Accordingly, because BB&T prevailed in the district court, and is not otherwise aggrieved by that court's breach ruling, we dismiss BB&T's cross-appeal.  *See Agripost, Inc. v. Miami-Dade Cnty., ex rel. Manager*, 195 F.3d 1225, 1229–30 & n. l2 (11th Cir. 1999).

to complain about the contract being broken.") (internal quotations, citations omitted).

Whether BB&T did or didn't breach the participation agreement—the district court found that it did—is a difficult question.  The contract seems to us to be a maze of internally contradictory provisions that interact with each other in inconsistent ways.  Fortunately for us, the issue of breach is ultimately irrelevant because we hold that the district court correctly concluded that LNV failed to prove its damages with sufficient (or really any) certainty.  Bad facts make bad law—so too with bad contracts.  Since we needn't determine whether BB&T breached the agreement, we won't.  Instead, we'll move directly to a consideration of LNV's damages arguments.

First, some contract-damages basics.  Under Georgia law, damages for breach of contract "are given as compensation for the injury sustained as a result of the breach of a contract," and "[d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." Ga. Code Ann. §§ 13-6-1, 13-6-2; *see also, e.g.*, Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. I: Civil Cases, § 18.010 (5th ed. 2017) ("Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from

6

the breach and such as the parties contemplated when the contract was made as the probable result of the breach."). Accordingly, Georgia courts have explained that a plaintiff suing for breach of contract should, if successful, recover the full benefit of his bargain, but no more. *See Al & Zack Brown, Inc. v. Bullock*, 518 S.E.2d 458, 461 (Ga. Ct. App. 1999) (explaining that a damage award should "put [the plaintiff] in as good a position as if the defendant had fully performed the contract") (internal quotation marks omitted); *Gainesville Glass Co., Inc. v. Don Hammond, Inc.*, 278 S.E.2d 182, 185–86 (Ga. Ct. App. 1981) ("[A]n injured party cannot be placed in a better position than he would have been in if the contract had not been breached.").

Importantly here, Georgia courts have held—in common with the prevailing understanding—that while a plaintiff need not prove a precise measure of damages, it must provide "data sufficient to enable [the factfinder] to estimate with reasonable certainty the amount of the damages." *Simmons*, 335 S.E.2d at 663. The factfinder, that is, "cannot be left to speculation, conjecture and guesswork." *Id.*; *see also, e.g.*, *McCannon v. McCannon*, 499 S.E.2d 684, 686 (Ga. Ct. App. 1998) (damages must be proved "to a reasonable certainty"); Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). In this lawsuit, LNV thus had the burden of proving a "reasonabl[y] certain[]"

7

estimation of its expectation interest—or whatever benefit its bargain with BB&T warranted.  As we explain below, we agree with the district court that LNV failed to prove this essential cornerstone.

## A

Before getting into the specifics of LNV's damages claim, we must first address LNV's preliminary contentions (1) that Georgia law tasks it with only a minimal burden of proof and (2) that the district court's analogy to legal-malpractice cases was legally erroneous.

## 1

Burden of proof—how much, and who has it—features prominently in LNV's damages argument.  LNV attempts to minimize its burden with two lines of argument: first, it argues that "[o]nce LNV established the amount it was presumptively owed, the burden shifted to BB&T to prove any reduction of this amount"; second, LNV contends that "[o]nce the fact of causation is established, the burden of proving damages is much less severe."  Br. of Appellant at 26, 39.  Neither argument withstands scrutiny.  To support its first line of attack, LNV focuses on dicta in an unrelated antitrust opinion, *Willesen v. Ernest Communications, Inc.*, 746 S.E.2d 755 (Ga. Ct. App. 2013).  Even setting *Willesen*'s off-point-ness aside, LNV fails to meet the seemingly lighter burden

8

that it seeks to invoke because—as we explain below—LNV failed (to use its phrase) to "establish[] the amount it was presumptively owed."

LNV's second argument fares no better. LNV repeatedly suggests that it need not prove damages with exact precision because it effectively proved causation of damages—*i.e.*, breach—even if it did not prove these damages' precise quantum. But this supposedly reduced burden of proof is really just the well-established "reasonable certainty" requirement, already discussed, which—for reasons we will also explain—LNV fails to meet.

**2**

LNV's second broadside is to suggest that the district court's invocation of damage calculations in legal-malpractice suits constituted reversible legal error. LNV's contention is unavailing. Not only does LNV overstate the district court's reliance on the malpractice framework—although the court noted that it found the approach "instructive," nowhere in its opinion did the court claim to adopt the malpractice standards wholesale—but contrary to LNV's critique, the basic damages framework that applies in legal-malpractice cases *is* applicable to the instant case.

The district court looked to legal-malpractice claims to conceptualize expectation interest—an essential component of any damages calculation—and found that the success of BB&T's litigation against the loan guarantor Duncan and

the subsequent collectability of the loan's payout from Duncan necessarily affected LNV's legitimate expectation.  Despite LNV's assertions, this approach strikes us as neither particularly novel nor unique.  Rather, it represents a commonsensical intuition that applies across various contexts: damages reflect expectations; expectations must account for the uncertainty of contingent inputs necessary to produce the expected outcome; therefore, damages must be discounted by the contingencies' probability of occurring.  *Cf. In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1335 (11th Cir. 2007) (reasoning that "the proper approach [to valuing an asset] would have simply discounted the expected value of the judgment by the probability of its ever occurring").

The district court analogized to legal malpractice lawsuits because there, as here, a court has to discount the face value of a potential recovery by the probability that requisite events—winning the underlying lawsuit and then collecting the award—will occur.  Such analysis is not "appropriate *only* in certain legal malpractice cases," as LNV contends, Br. of Appellant at 29 (emphasis added), but is instead a rational extension of malpractice lawsuits' probabilistic analysis.  The district court therefore did not err when it sought to determine the ways in which the probability of events essential to recovery affected the value of LNV's legitimate expectation, and hence its recovery.

\* \* \*

10

Having dealt with LNV's global critiques of the district court's methodology, we turn to its more particularized efforts to meet the "reasonable certainty" standard for proving its damages.

**B**

Unpredictability enshrouds every facet of the participation agreement's potential payouts, and thus sets a high hurdle for LNV in its attempt to prove damages to a reasonable certainty.  As already explained, the malpractice-suit analogy is helpful insofar as it illustrates that, in order to determine damages, a court must discount any likely recovery by the probability of success in both the litigation and the post-litigation collection.  The district court applied these principles to the instant case, holding that "LNV failed to show that BB&T likely would have obtained a favorable judgment against Duncan, and how much, if any, of a favorable judgment it likely would have collected from him."  Without proving the probability of the necessary inputs, LNV failed to provide any guidance in determining an appropriate expected outcome.  The district court therefore had no benchmark against which it could assess the payout that LNV actually received, which left the court with no choice but to award zero damages. The same deficiency persists before us.

On appeal, LNV principally argues that our damages analysis should begin and end with the $34.6 million face value of the Owls Head loan.  In particular,

11

LNV points to Paragraph 14(b) of the participation agreement and asserts that "[a]warding LNV damages under [that provision] is … consistent with the principles governing benefit of the bargain damages" because "the parties bargained for a specific price that BB&T would pay LNV in the event BB&T wished to materially modify the loan documents without obtaining LNV's consent." Br. of Appellant at 20–22. We fail to understand the argument—and to the extent we understand it, we reject it. Paragraph 14(b) reads (with our emphasis added) as follows:

> (b) If Participant [*i.e.*, LNV] is unwilling to consent to any amendment or modification of, or waiver of compliance with, the Loan Agreement or any other Loan Document (where the consent of Participant is required), Seller [*i.e.*, BB&T] *shall have the right, but not the obligation*, to repurchase Participant's Participation at such time for a purchase price equal to (A) Participant's Share of any and all unpaid advances of the Loans made by Seller to Borrower under the Loan Agreement, and (B) any and all unpaid interest thereon and fees in connection therewith in which Participant shares hereunder (but subject to Seller's right of offset under Section 6(d) hereof, if applicable).

There can be no serious argument that Paragraph 14(b) required BB&T to repurchase LNV's shares at full face value—here, 23.08% of $34.6 million. By its plain terms, the provision gave a "right"—*i.e.*, an option—to buy out LNV, but it expressly did "not" impose any "obligation" on BB&T to do so. Accordingly, contrary to LNV's lead argument, the parties did not "bargain for a specific price

that BB&T *would* pay LNV," but rather agreed only that BB&T *could* buy out LNV in order to modify the Owls Head loan.

Since the participation agreement never mandated such a payout, LNV's damages model necessarily presumes (1) that BB&T would have prevailed in what surely would have been a lengthy litigation against Duncan, the guarantor; (2) that following its triumph in court, BB&T would have collected a hundred cents on the dollar from Duncan; and (3) that this eventuality accurately reflected the parties' bargain and expectations.  Full face-value recovery on a defaulted loan collateralized by recession-wrecked Florida real estate would seem to defy even the most expansive conception of "expectation interest," leaving LNV with a steep uphill climb in its efforts to prove its damages to a reasonable certainty.

Those efforts are unavailing.  In its attempt to satisfy the first contingency on its road to recovery—that is, to prove that BB&T would have prevailed in its suit against Duncan—LNV cites to a memorandum from August 2010 in which BB&T's attorneys expressed optimism concerning its litigation prospects.  Along with other pleadings, LNV suggests that this document "satisfied any burden to show that BB&T would have obtained a judgment against Duncan for the full amount of the loan."  Br. of Appellant at 31.  In the same memo, however, the attorney wrote that "the more time this [litigation] takes the more likely a success

by way of a paper judgment may be rendered meaningless by an inability to collect."

The memo and other pleadings to which LNV cites are not only insufficient to show that BB&T would have recovered "the full amount of the loan" for BB&T's breach, but, even assuming success at trial, none of LNV's proffered evidence convincingly demonstrates what LNV and BB&T would have ultimately collected from Duncan.  As BB&T points out, LNV does nothing to engage with the collectability issue, except to erroneously argue that it is not required to engage with the collectability issue.  Nor does LNV persuasively demonstrate that it reasonably expected or bargained for some payout that was reasonably certain to exceed what it received.

In the event of breach, the breaching party should make the party that suffered the breach whole; that is, the breaching party should pay the non-breaching party the difference between expectation interest and any recovery that the non-breaching party subsequently obtains.  We know the precise figure of LNV's post-breach recovery—$577,000 (on a $197,000 investment).  What we still do not know—because LNV has not shown us—is what LNV expected to receive, or what the parties "bargained" for.  To be sure, full face value recovery is not LNV's only theory of damages—on appeal, LNV argues (albeit seemingly for the first time) that it is entitled to at least some damages either (1) because the

14

proceeds of the $10 million settlement were unfairly allocated between the JLD and Owls Head loans or (2) because the district court should have awarded relief based on the value of the underlying collateral.  But LNV's failure to prove its expectation dooms every damage theory to a common fate; without offering serious evidence of its expectation interest or the benefit of its bargain with BB&T, LNV cannot prove that the $577,000 payout it received was damagingly inadequate.  The district court therefore rightly rejected LNV's primary and auxiliary damages arguments.[3]

## III

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

[3] Finally, LNV asserts that it is entitled to a remand on the issue of attorneys' fees.  That is incorrect.  The district court correctly held that Georgia law prohibits an award of attorneys' fees in the absence of other monetary or affirmative relief. *See, e.g.*, *Benchmark Builders, Inc. v. Schultz*, 711 S.E.2d 639, 640 (Ga. 2011)).